# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF TEXAS

# SHERMAN DIVISION

| | | |
|---|---|---|
| **RAUL CORTEZ, #999543,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:13cv83** |
| | § | |
| **DIRECTOR, TDCJ-CID,** | § | |
| | § | |
| **Respondent.** | § | |

## MEMORANDUM OPINION AND
## ORDER OF DISMISSAL

Petitioner Raul Cortez, an inmate confined in the Texas prison system, filed the above-styled and numbered petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Cortez is challenging his capital murder conviction and death sentence imposed by the 416th Judicial District Court of Collin County, Texas in Cause Number 416-82415-07, in a case styled *The State of Texas v. Raul Cortez*. For reasons set forth below, the Court finds that the petition is not well-taken and that it will be denied.

## Procedural History of the Case

On February 2, 2009, Cortez was convicted of the offense of capital murder for shooting and killing Austin York in the course of committing the offense of robbery and burglary, in violation of Tex. Penal Code § 19.03(a)(2). The Texas Court of Criminal Appeals ("TCCA") affirmed the conviction and death sentence. *Cortez v. State*, No. AP-76101, 2011 WL 4088105 (Tex. Crim. App. Sept. 14, 2011) (unpublished). Cortez did not file a petition for a writ of certiorari.

Cortez filed an application for a writ of habeas corpus in state court on May 31, 2011. An evidentiary hearing was conducted beginning on April 30, 2012. The state trial court issued extensive

1

findings of fact and conclusions of law on November 2, 2012. The TCCA subsequently denied relief based on the trial court's findings and conclusions and on its own review. *Ex parte Cortez*, No. WR-78666-01, 2013 WL 458197, at *1 (Tex. Crim. App. Feb. 6, 2013) (unpublished).

Cortez began the present proceedings on February 14, 2013. He filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on February 4, 2014 (Dkt. #24). He filed an amended petition on May 6, 2014 (Dkt. #26). The Director filed an answer (Dkt. #38) on January 26, 2015. Coretz filed a reply (Dkt. #44) on July 11, 2015. Pursuant to an order of the Court, Cortez filed another amended petition for a writ of habeas corpus (Dkt. #49) on September 30, 2015. The parties were placed on notice that the latter amended petition is the operative petition in the case (Dkt. #48). The Director filed an answer (Dkt. #50) on November 20, 2015. Cortez did not file a reply.

## Factual Background of the Case

The TCCA thoroughly discussed the factual background of the case as follows:

Cortez, his brother Javier, and Eddie Williams developed a plan to take money from Rosa Barbosa, who worked as a cashier at Cliff's Check Cashing. The plan ended on March 12, 2004, at Rosa's house, with quadruple homicide—Rosa, her nephew Mark Barbosa, and Mark's two friends York and Matt Self each died after being shot in the head.

Several individuals confessed to the murders over the course of approximately three years, but all of them were eventually excluded as suspects by investigators. The murders remained unsolved until May 2007, when Williams's common-law wife informed police that Williams knew who committed the offense. After Williams's father died, Williams told his wife that Javier and Cortez committed the murders. Williams had been friends with Javier and, in the past, Williams had sold marijuana for him. Javier had introduced Williams to his brother Cortez. Williams voluntarily accompanied investigators to the police station, where his confession began. Williams informed investigators that he and the Cortez brothers were involved in the offense. At first, Williams minimized his role but, in the end, he took responsibility for two of the murders.

At Cortez's trial, Williams testified about the events surrounding the execution-style murders. Williams was charged with capital murder and did not have any agreement with the State in exchange for his testimony.

2

About two weeks before the offense, Williams accompanied Cortez to a pawn shop where Cortez purchased a chrome .25 caliber automatic handgun. They also stopped at a nearby "spy shop" where Cortez purchased handcuffs. Williams returned to the pawn shop with Cortez to pick up the gun after the requisite waiting period passed. At some point before the offense, Cortez tested the gun by shooting it at the ceiling in his house. Javier was stationed outside in the back yard to determine if he could hear the shot.

On the day of the offense, Javier and Cortez picked up Williams at home in Javier's white, four-door Cavalier and went to Cortez's house. Cortez took out a black pistol-grip shotgun, a .38 caliber revolver, and a chrome .380 automatic handgun. Cortez gave the .380 to Williams and told him that it did not work. The three hung out and smoked marijuana. Javier then asked Williams if he wanted to go with them to a woman's (Rosa's) house and rob her. Javier told Williams that he had been watching Rosa for a while and knew that she would take a blue money bag home from Cliff's Check Cashing to cash checks for illegal immigrants from Mexico. Javier had followed Rosa home the night before the offense and knew that she had a car, which Williams indicated would be used as a getaway car. Javier and Cortez instructed Williams about his role—Williams was to knock on Rosa's door and inquire about a lost puppy. Williams explained his reasons for participating in the offense—he believed that Rosa would have "thousands," and he needed money.

The three set out for Rosa's house on foot. Javier and Williams took one route while Cortez took a separate route. Cortez carried the .38, the .25, plastic zip ties, latex gloves, duct tape, and masks in a black gym bag. Cortez was already at Rosa's house when Javier and Williams arrived. Javier and Cortez then started to put on the latex gloves and masks. Williams noticed that they also put on black gloves over the latex gloves. Cortez carried the .25, Javier had the .38., and Williams had the .380. Williams knocked on the door and, when Rosa answered, he asked her if she had seen his lost puppy. Cortez and Javier ran around Williams and pushed Rosa down inside the house. Williams observed that Rosa was handcuffed when Javier closed the door. Cortez and Javier then picked up Rosa, took her to her bedroom, and pushed her onto the bed. Rosa's head hit the bed, and she fell to the floor. Cortez taped Rosa's hands behind her back and removed the handcuffs. When Javier asked Rosa where the money was, she told them she did not have any money. Javier then asked Rosa for her alarm pin number and keys to Cliff's Check Cashing. Williams testified that Rosa gave them the keys and code. Williams heard a "pop" after Cortez "disappeared" into Rosa's room.

When Cortez returned to the living room, the three boys-Mark, York, and Self, unexpectedly entered the front door. Cortez "opened fire." Two of the boys headed towards Mark's bedroom, while one went out the front door. Cortez brought the boy back in and put him in Mark's room. Cortez gave Williams the .25, took the .38 from Javier, and ordered Williams to shoot the boys. Williams shot Mark once in the head and shot the other boy twice-once on the shoulder and once in the head. Williams handed the gun back to Cortez, and Cortez shot the third boy in the head. Williams and Javier headed out to Self's truck, which was in the driveway, and heard more shots coming from the house before Cortez exited.

Williams testified that, at some point during the offense, Cortez had taken Williams's latex gloves because Cortez's got "busted."

Javier drove the three to Cliff's Check Cashing in Self's truck. Javier went inside and ran back outside when the alarm sounded. Javier could not find the safe. Javier told them that Rosa gave them a false alarm code.

Javier then drove them to Cortez's house. Javier and Williams got into Javier's car and followed Cortez, who took over driving Self's truck. Williams asked Javier to drop him off at home, but Javier continued to follow Cortez. They headed south towards Dallas on Highway 75. Javier said, "[W]e'll take this to our grave." Cortez then abandoned the truck in an apartment complex after wiping his fingerprints from the truck. Cortez sat behind Williams in Javier's car and, while they were on the highway, Cortez broke the guns down and threw the pieces out the window. Javier then took Williams home.

Mark's brother and his friend arrived at Rosa's house shortly after the offense and discovered the bodies. Rosa was in her bedroom lying face down on the floor. She had red duct tape around her mouth and a tightened zip-tie around her neck. Her hands were not bound. Mark, York, and Self were in Mark's bedroom. Mark was on his bed with his head hanging toward the floor. York was slumped over at the end of Mark's bed. Self was on the floor near York. Mark's brother observed that Self had a gunshot wound to the head, which dislodged one of his eyes from the socket. Self was still breathing, however, and the paramedics were able to transport him by helicopter to Baylor Hospital. Self later died after his parents decided to remove him from life support.

The Collin County medical examiner testified that there was evidence that Rosa's hands had been bound and that she had been strangled. He stated that Rosa had a blunt-force injury to the left side of her face. She had a gun-shot wound at the back of her head on the left side. The medical examiner also discovered pieces of latex glove stuck to the duct tape that had been wrapped around her head and mouth. The medical examiner testified that York had three gun-shot wounds. One was located at the back-left of York's head. The medical examiner recovered an intermediate caliber bullet that had a blue coating. The second wound was on the right back-side of York's neck, and the third wound was on York's back-right shoulder area. The medical examiner testified that the bullets from those wounds were from a smaller caliber gun. The medical examiner discovered two wounds on Mark-one in the back of his head and one in his right arm. The one in Mark's head came from a smaller caliber gun than the one in the arm. The bullet recovered by the medical examiner from Mark's arm also had a blue coating.

The Dallas County medical examiner testified that Self had a gunshot wound to the back right side of his head. The medical examiner recovered a deformed medium caliber bullet with a blue coating from Self's right lower eyelid.

Including the bullets recovered during the autopsies, investigators recovered some other bullets and shell casings from the crime scene. In all, they recovered five .25 caliber shell

casings, six fired .25 caliber bullets, and three fired .38 caliber bullets. A ballistics examiner testified that the .38 bullets had a blue nylon coating. The five .25 caliber casings, according to the examiner, had been fired from the same weapon. Additionally, the five .25 bullets had been fired from the same weapon. After Williams's confession, investigators went to the home that Cortez had lived in at the time of the offense to determine whether there was any evidence of the "test" bullet that Williams said that Cortez had fired into the ceiling with the .25 Cortez had purchased from the pawn shop. They discovered a hole in the ceiling that had been patched and, in the hole, they found a .25 caliber bullet lodged in plywood. The ballistics examiner matched that bullet with the others recovered during the autopsies and concluded that they had all been fired from the same weapon.

Cortez could not be excluded as a contributor of the DNA on the pieces of latex glove that had been stuck to the duct tape around Rosa's head. Dr. Rick Staub, testifying for the State, maintained that the most discriminating sample taken from the latex pieces showed that only one in 14,910 or 1/149th of the Southwest Hispanic population could be possible contributors. Dr. Staub identified Cortez, a member of the Southwest Hispanic population, as a possible contributor. And regarding another sample, only one in 2,540 of the Southwest Hispanic population could be a contributor, and Dr. Staub identified Cortez as a contributor. Finally, regarding another sample, only one in 1,122 or 1/11th of the Southwest Hispanic population could be a contributor. Dr. Staub again identified Cortez as a possible contributor.

When investigating Williams's account, law enforcement officers asked Williams to guide them to the relevant places that would connect him to Cortez, Javier, and the offense. Williams showed them the Cortez brothers' parents' house, Cortez's house and workplace at the time of the offense, Javier's home at the time of the offense, the route Williams and Javier took to Rosa's house, the parking space in the apartment complex where Cortez abandoned Self's truck, the pawn shop where Cortez purchased the .25, and the Spy Center shop where Cortez purchased the handcuffs.

Investigators were also able to confirm several facts and circumstances relating to the offense. Among other things, they were able to verify that Cortez had purchased a .25 caliber handgun from the pawnshop in February 2004, five weeks before the murders. They also determined that Cortez had lived at the apartment complex where Cortez abandoned Self's truck. Self's truck had been parked across from Cortez's old apartment unit. Investigators also confirmed that Javier owned a white Cavalier at the time of the offense. Finally, they established that Cortez and Javier had both been customers of Cliff's Check Cashing.

*Cortez*, 2011 WL 4088105, at *1-4. The TCCA found that the evidence was sufficient to support the conviction. *Id.* at *5.

## Grounds for Relief

Cortez brings the following grounds for relief:

1. Ineffective assistance of counsel at trial.

2. Ineffective assistance regarding punishment.

3. Withholdings in violation of *Brady v. Maryland*.

4. Sufficiency of the evidence.

5. TDCJ classification testimony.

6. Voir dire issues.

7. The trial court erred in denying Cortez's motion for a change of venue.

8. The trial court erred in denying Cortez's motion for a new trial when the prosecutor's argument that proposed a question to the defendant directly in his face violated his Fifth Amendment right not to testify.

9. The statute under which Cortez was sentenced to death is unconstitutional in violation of the cruel and unusual punishment prohibition of the Eighth Amendment.

10. The statute under which Cortez was sentenced to death is unconstitutional in violation of the Eighth Amendment as interpreted by *Penry v. Johnson* because the mitigation special issue sends mixed signals to the jury thereby rendering any verdict reached in response to the special issue intolerable and unreliable.

11. The statute under which Cortez was sentenced to death is unconstitutional in violation of the due process requirements of the Fourteenth Amendment.

12. The trial court erred in denying Cortez's motion to hold Article 37.071 Sec. 2(e) and (f) concerning burden of proof unconstitutional as a violation of Article One Sec. 10 and Sec. 13 of the Texas Constitution.

13. The Texas death penalty scheme violates due process protections because the punishment special issue related to mitigation fails to require the State to prove the absence of sufficient mitigating circumstances beyond a reasonable doubt, contrary to *Apprendi* and its progeny.

14. The Texas death penalty scheme violated Cortez's rights against cruel and unusual punishment and due process of law under the Eighth and Fourteenth Amendments by

requiring at least ten "no" votes for the jury to return a negative answer to the punishment special issues.

15. The Texas death penalty scheme violated Cortez's rights against cruel and unusual punishment, an impartial jury, and to the due process of law under the Eighth, Sixth and Fourteenth Amendments because of vague, undefined terms in the jury instructions at the punishment phase that effectively determine the difference between a life sentence and the imposition of the death penalty.

16. The Texas death penalty scheme denied Cortez due process of law and imposed cruel and unusual punishment in violation of the Fifth, Eighth, and Fourteenth Amendments because of the impossibility of simultaneously restricting the Jury's discretion to impose the death penalty while also allowing the jury unlimited discretion to consider all evidence militating against imposition of the death penalty.

17. The Texas death penalty scheme denied Cortez due course of law and imposed cruel and unusual punishment in violation of Article I, §§ 13 and 19 of the Texas Constitution because of the impossibility of simultaneously restricting the Jury's discretion to impose the death penalty while also allowing the jury unlimited discretion to consider all evidence militating against imposition of the death penalty.

18. The trial court erred in overruling Cortez's motion to hold Article 37.071 Sec. 2(e) and (f) unconstitutional because it fails to require the issue of mitigation be considered by the jury (CR:1370-1373).

19. The statutory "*Penry*" special issue in Tex. Code Crim. Pro. Arts. 37.071 & 37.0711 is unconstitutional because it fails to place the burden of proof on the State regarding aggravating evidence.

20. The statutory "*Penry*" special issue is unconstitutional under the Eighth and Fourteenth Amendments to the Constitution because it permits the very type of open-ended discretion condemned by the United States Supreme Court in *Furman v. Georgia*.

21. Texas' statutory capital sentencing scheme is unconstitutional under the Eighth and Fourteenth Amendments because it does not permit meaningful appellate review.

22. The trial court erred in overruling Cortez's second motion to set aside the indictment as being unconstitutional based on the enumerated constitutional defects of the Texas capital murder death penalty law.

23. The cumulative effect of the above-enumerated constitutional violations denied Cortez due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

24.     The cumulative effect of the above-enumerated constitutional violations denied Cortez due course of law under Article I, § 19 of the Texas Constitution.

**Standard of Review**

The role of federal courts in reviewing habeas corpus petitions by prisoners in state custody is exceedingly narrow. A person seeking federal habeas corpus review must assert a violation of a federal constitutional right. *Lowery v. Collins*, 988 F.2d 1364, 1367 (5th Cir. 1993). Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also present. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996), *cert. denied*, 520 U.S. 1242 (1997). In the course of reviewing state proceedings, a federal court does "not sit as a super state supreme court to review error under state law." *Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007) (citations omitted), *cert. denied*, 552 U.S. 1314 (2008); *Porter v. Estelle*, 709 F.2d 944, 957 (5th Cir. 1983), *cert. denied*, 466 U.S. 984 (1984).

The petition was filed in 2014, thus review is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 327 (1997). Under AEDPA, a petitioner who is in custody "pursuant to the judgment of a State court" is not entitled to federal habeas corpus relief with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). "By its terms § 2254 bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562

U.S. 86, 98 (2011). AEDPA imposes a "highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citation and internal quotation marks omitted). With respect to the first provision, a "state court decision is 'contrary to' clearly established federal law if (1) the state court 'applies a rule that contradicts the governing law' announced in Supreme Court cases, or (2) the state court decides a case differently than the Supreme Court did on a set of materially indistinguishable facts." *Nelson v. Quarterman*, 472 F.3d 287, 292 (5th Cir. 2006) (en banc) (quoting *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003)), *cert. denied*, 551 U.S. 1141 (2007). "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011). As such, "evidence later introduced in federal court is irrelevant." *Id.* at 184. "The same rule necessarily applies to a federal court's review of purely factual determinations under § 2254(d)(2), as all nine Justices acknowledged." *Blue v. Thaler*, 665 F.3d 647, 656 (5th Cir. 2011), *cert. denied*, 133 S. Ct. 105 (2012). With respect to § 2254(d)(2), a Texas court's factual findings are presumed to be sound unless a petitioner rebuts the "presumption of correctness by clear and convincing evidence." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (citing § 2254(e)(1)). The "standard is demanding but not insatiable; . . . [d]eference does not by definition preclude relief." *Id.* (citation and internal quotation marks omitted). More recently, the Supreme Court held that a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (citation omitted). The Supreme Court has explained that the provisions of AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Federal habeas corpus relief is not available just

9

because a state court decision may have been incorrect; instead, a petitioner must show that a state court decision was unreasonable. *Id.* at 694. Furthermore, when a state court provides alternative reasons for denying relief, a federal court may not grant relief "unless *each* ground supporting the state court decision is examined and found to be unreasonable under AEDPA." *Wetzel v. Lambert*, 565 U.S. ___, ___, 132 S. Ct. 1195, 1199 (2012) (emphasis in original).

## Discussion and Analysis

### Claim Number 1:      Ineffective assistance of counsel at trial

Cortez initially presents a lengthy claim of ineffective assistance of counsel at trial, which includes four subclaims. Ineffective assistance of counsel claims are governed by the Supreme Court's standard established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* provides a two-pronged standard, and the petitioner bears the burden of proving both prongs. *Id.* at 687. Under the first prong, he must show that counsel's performance was deficient. *Id.* To establish deficient performance, he must show that "counsel's representation fell below an objective standard of reasonableness," with reasonableness judged under professional norms prevailing at the time counsel rendered assistance. *Id.* at 688. The standard requires the reviewing court to give great deference to counsel's performance, strongly presuming counsel exercised reasonable professional judgment. *Id.* at 690. Under the second prong, the petitioner must show that his attorney's deficient performance resulted in prejudice. *Id.* at 687. To satisfy the prejudice prong, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. An ineffective assistance of counsel claim fails if a petitioner cannot satisfy either the deficient performance or prejudice prong; a court need not evaluate both if he makes an insufficient showing as to either. *Id.* at 697.

## A.    Failure to call Gustavo Rodriguez

Cortez initially alleges that trial counsel was ineffective for failing to investigate, interview and present three key witnesses, including an eye witness and an alibi witness. The first person he specifically named was Gustavo Rodriguez. Cortez describes Rodriguez as the only uninterested eyewitness to the crime. Prior to trial, on May 31, 2005, Rodriguez gave a written statement to McKinney police. *See* 1 SHCR 90.[1] He specified that he was Rosa Barbosa's neighbor at the time of the murders in March of 2004. He stated that he arrived at his home at 7:00 or 7:30 p.m. It was not quite dark. He saw that Matt, Austin and Mark were already there. He knew that they were there because he recognized the truck that belonged to Matt. He stated that about twenty minutes after Rosa got home, Matt, Austin and Mark left in the truck about 8:00 p.m. Rodriguez stated that he was outside in his yard at the time. The next thing he noticed was that the truck had returned. He did not know how long they were gone, "but it wasn't as much as an hour." *Id.* They all went inside. The next thing he remembered was the truck starting up again. Rodriguez looked outside and saw different people in the truck. Since the truck had tinted windows, he could not see who was in the truck. He could tell there were at least three people. When the doors were open and the interior light was on, he "could tell that it was black guys in the truck." *Id.*

Rodriguez's observations were fully developed during the state habeas corpus proceedings. He testified through an interpreter at the evidentiary hearing. 3 SHRR 122-47. He testified that it was getting dark at the time he saw people in the truck. *Id.* at 124. The street lamps were already on. *Id.*

---

[1]"CR" refers to the clerk's record on direct appeal, preceded by the volume number and followed by the page number. "RR" refers to the reporter's record of the transcribed testimony during the trial, preceded by the volume number and followed by the page number. "SHCR" refers to the state habeas clerk's record, preceded by the volume number and followed by the page number. "SHRR" refers to the reporter's record of the transcribed testimony during the state habeas evidentiary hearing, preceded by the volume number and followed by the page number.

He was inside of his house approximately twenty to twenty-five feet from the truck. *Id.* He testified that his impression that the people were black was based on their hair, which he described as curly but not too much like an afro. *Id.* at 125. He repeatedly testified that he was not paying that much attention to the people in the truck, but he paid some attention due to the fact that he observed different people than normal in the vehicle. *Id.* at 135. On cross-examination, he testified that the people in the back seat were African-American and the driver was Hispanic. *Id.* at 136. He subsequently testified that the people in the backseat had hair like Puerto Rican or Dominican people, who "also share the same color as those that are Afro American." *Id.* at 145-46.

Cortez stresses that Rodriguez's testimony at trial would have been critical for three reasons: (1) he is Hispanic and has very light skin and could not have been mistaken for an African-American man; (2) a number of the alternative perpetrators and confessors were African-American, and (3) Rodriguez's description of events did not comport with how Eddie Williams described their exit from the scene.

Cortez's trial attorneys testified during the state habeas evidentiary hearing. They explained why they did not call Rodriguez as a witness. The first attorney to testify was John Tatum. He testified that initially he was very interested in the possibility of calling Rodriguez as a witness. 2 SHRR 26. He did not personally talk to Rodriguez, but he sent one of his investigators to speak to him. Bill Hunt was the investigator who talked to Rodriguez. Tatum recalled talking to Hunt about the interview and deciding that Rodriguez would not be too helpful. *Id.* at 26-27. He explained that their plan was to attack the credibility of Eddie Williams, but Rodriguez would have provided testimony that would have confirmed Williams' testimony. *Id.* at 27. Rodriguez would have confirmed that at least one of the perpetrators was black, and Williams was black. *Id.* He would have also confirmed Williams' claim there was three perpetrators and the time line provided by Williams.

*Id.* Furthermore, with respect to Rodriguez's impression that there were three black men, Tatum acknowledged that there was evidence that Raul and Javier Cortez wore black clothes, along with black ski masks. *Id.* at 105. Overall, the defense team had a strategy of wanting the jury to consider other suspects, and Rodriguez' testimony would have foreclosed that avenue. *Id.* at 110-111. Tatum testified that the defense team discussed the value of Rodriguez's testimony and determined that "it was going to be more harmful than helpful." *Id.* at 111.

Richard Franklin, another attorney who represented Cortez, likewise testified that the defense team was interested in talking to Rodriguez. *Id.* at 61. He, nonetheless, emphasized that they would have never placed him on the stand because he would have confirmed Eddie Williams' testimony. *Id.* He stressed that no other witness could have corroborated Williams' testimony. *Id.* He was particularly concerned that Rodriguez would have confirmed Williams' tale about the three men leaving the scene in Matt Self's truck. *Id.* at 62. He expressed the opinion that killers leaving the scene in someone else's car "was kind of an unusual exit." *Id.*

Franklin was recalled as a witness on the second day of the evidentiary hearing. Like Tatum, he testified that Williams told police that Raul and Javier Cortez were dressed all in black and had slits only for their eyes and an opening for their mouth. 3 SHRR 68. This supported Rodriguez's impression that the perpetrators were three black men. The defense team developed the strategy "to throw in a lot of other suspects" and "demonstrate that the whole investigation was so messed up that [the McKinney Police Department] could never get it right." *Id.* at 70. He reiterated that Rodriguez's testimony would have corroborated Williams' testimony and would have put a "nail in the coffin" as to another potential suspect, Daniel Guajardo. *Id.* at 71.

The state trial court issued findings of fact and conclusions of law following the hearing. The trial court recounted Rodriguez's version of events as set forth in his police statement (3 SHCR 698-

99), Williams' pretrial interviews and trial testimony (3 SHCR 699-700), James Jones' police interviews (3 SHCR 700), and the trial testimony regarding Daniel Guajardo (3 SHCR 701). The state trial court noted that neither Jones nor Guajardo related a version of events in which the killers left Rosa Barbosa's house in Matt Self's truck (3 SHCR 701).

The state trial court found that counsel, in fact, investigated Rodriguez. 3 SHCR 701. The Court notes that Cortez stresses that Rodriguez testified that no one from the defense team contacted him. 3 SHRR 127. Nonetheless, there was evidence that Hunt spoke to Rodriguez prior to trial, and the state trial court accordingly made the finding of fact that Hunt spoke with him prior to trial. 3 SHCR 702. The trial court observed that Rodriguez testified that Police Detective Diana Tilton was the only person he talked to about the case, but his memory "does not seem accurate since Rodriguez gave his police statement to a different officer, Steve Riley, and Rodriguez does not seem to remember interacting with Officer Riley." *Id.* The Texas Court of Criminal Appeals subsequently adopted these findings. Cortez has not rebutted the presumption of correctness of these findings by clear and convincing evidence, as required by 28 U.S.C. § 2254(e)(1).

The state trial court went on to find that counsel made a strategic decision not to call Rodriguez to testify. 3 SHCR 702. The court concluded that the strategic decision was reasonable. *Id.* The court further found that counsel weighed the value of Rodriguez's likely testimony and determined that it would be more harmful than helpful. *Id.* The court found that Rodriguez would have confirmed Williams' testimony, that Cortez would have been harmed by such testimony, and that it was reasonable for counsel to avoid such testimony. *Id.* at 703-04. Rodriguez's testimony would have limited defensive strategies. *Id.* at 704. The trial court ultimately found that counsel's representation was not deficient for deciding not to call Rodriguez to testify. *Id.* at 705.

The state trial court additionally found that Cortez had not shown that Rodriguez's testimony would have been beneficial. *Id.* at 706. It was noted that Rodriguez was admitted to a hospital two days before he was supposed to go to court and that he was not discharged until after he was supposed to go to court. *Id.* The trial court observed that there was no evidence Rodriguez was medically able to come to court during the trial. *Id.* The court further observed that Rodriguez did not provide a credible or reliable identification of the men's races. *Id.* at 709. By comparison, "Williams provided a detailed, credible first-hand account of the murders." *Id.* at 712. The trial court found that the jury would not have acquitted Cortez if Rodriguez had testified. *Id.* The trial court ultimately found that Cortez was not prejudiced by counsel's failure to call Rodriguez to testify. The Texas Court of Criminal Appeals subsequently denied relief based on the trial court's findings and conclusions and its own review. *Ex parte Cortez*, 2013 WL 458197, at *1.

In analyzing Cortez's claim that counsel was ineffective at trial for failing to investigate or calling Rodriguez as a witness, it should be emphasized that the Fifth Circuit "has repeatedly held that complaints of uncalled witnesses are not favored in federal habeas review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (citation omitted). *See also Charles v. Stephens*, 736 F.3d 380, 390-91 (5th Cir. 2013) (same), *cert. denied*, 135 S. Ct. 52 (2014). The Supreme Court specified in *Strickland* that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *See Strickland,* 466 U.S. at 690-91. In applying *Strickland*, the Fifth Circuit accordingly held that "the failure to present a particular argument or evidence is presumed to have been the result of strategic choice." *Taylor v.*

15

*Maggio*, 727 F.2d 341, 347-48 (5th Cir. 1984). Federal courts "will not question a counsel's reasonable strategic decisions." *Bower v. Quarterman*, 497 F.3d 459, 470 (5th Cir. 2007), *cert. denied*, 553 U.S. 1006 (2008). Habeas corpus relief is unavailable if a petitioner fails to overcome the presumption that counsel made sound strategic decisions. *Del Toro v. Quarterman*, 498 F.3d 486, 491 (5th Cir. 2007), *cert. denied*, 552 U.S. 1245 (2008).

In the present case, counsel made the strategic decision not to call Rodriguez to testify after determining that his testimony would be more harmful than helpful. An informed decision to forego "double-edged" evidence is a reasonable trial strategy. *See Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 1244 (2013); *Hopkins v. Cockrell*, 325 F.3d 579, 586 (5th Cir.), *cert. denied*, 540 U.S. 968 (2003); *Rodriguez v. Quarterman*, 204 F. App'x 489, 500 (5th Cir. 2006), *cert. denied*, 549 U.S. 1350 (2007). Counsel reasonably concluded that Rodriguez's testimony would have corroborated Williams' testimony and harmed their efforts to focus the jury's attention on other suspects. Counsel's informed decision to forego using Rodriguez as a witness was a reasonable trial strategy. Cortez has not shown that counsel's representation was deficient on this matter.

Cortez likewise failed to show that he was prejudiced by counsel's decision not to call Rodriguez as a witness. The state court reasonably found that Cortez has not shown that Rodriguez's testimony would have been beneficial. Moreover, Cortez did not show that Rodriguez was a credible witness. By comparison, Williams provided a detailed, credible first-hand account of the murders. Overall, Cortez has not satisfied *Strickland*'s prejudice prong with respect to counsel's failure to call Rodriguez as a witness. Counsel simply has not satisfied his burden of showing that counsel was ineffective for failing to call Rodriguez as a witness.

The ground for relief should be denied for the additional reason that Coretz has not shown, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary

to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

It is finally noted that in the context of § 2254(d), the deferential standard that must be accorded to counsel's representation must also be considered in tandem with the deference that must be accorded state court decisions, which has been referred to as "doubly" deferential. *Richter*, 562 U.S. at 105. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* "If the standard is difficult to meet, that is because it was meant to be." *Id.* at 102. *Also see Morales v. Thaler*, 714 F.3d 295, 302 (5th Cir.), *cert. denied*, 134 S. Ct. 393 (2013). Cortez has not satisfied his burden of overcoming the doubly deferential standard; thus, he is not entitled to federal habeas corpus relief on his first ineffective assistance of counsel claim.

## B.    Failure to interview of investigate Jake Joplin

Cortez next alleges that trial counsel was ineffective for failing to investigate or interview Jason "Jake" Joplin. Less than fifteen hours after the murder, Joplin gave a statement to Sgt. Steve Riley of the McKinney Police Department. In the statement, he gave a detailed account of an exchange that occurred between 5:00 and 5:30 p.m. at Cliff's Check Cashing on the day of the murder. The statement is attached to the petition as Exhibit 5. Joplin overheard one of three black males loitering outside say: "I am not going in there, they have cameras." Then, while standing in line, he noticed a black male standing in a different line who continued to look back outside and at the people around him. Then, one of the men he had observed outside came in and told the man in line to "hurry up." The men left the store. As Joplin left the store, he overheard one of the men make the following statement: "Fuck that, I'll kill the bitch."

Cortez stresses that Joplin gave a detailed description of the four men, none of whom meet the description of him or his brother Javier.  Joplin stated that he knew he could identify the man he saw outside of Cliff's Check Cashing and believed he could probably identify the men he saw standing outside.  Joplin insisted that the surveillance videos would confirm his account and that, given the timing of events in relation to the murder, it very well could be connected.  Cortez noted that there is no indication that the videos were ever obtained.  The statement was taken by Sgt. Riley and reviewed by Diana Tilton (Hale at the time), both of whom testified extensively at trial.  Neither side asked any questions about Joplin's statement or his description of events.

Cortez observed that the statement was provided to trial counsel, but Joplin was not called to testify at trial.  He further noted that the McKinney Police Department never approached Joplin again after taking his statement.  Moreover, trial counsel never talked to him.  He further complained that writ counsel never raised the issue at the state writ level in order to develop a record on the value and relevance of this witness.

The Director agrees that the issue was not raised at the state writ level.  He argues that the claim is unexhausted and procedurally defaulted.  He further argues that Cortez has not overcome the procedural default.

The ground for relief and response presents issues involving exhaustion of state remedies, procedural defaults and the Supreme Court's recent decisions in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013).  State prisoners bringing petitions for a writ of habeas corpus are required to exhaust their state remedies before proceeding to federal court unless "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant."  28 U.S.C. § 2254(b)(1).  In order to exhaust properly, a state prisoner must "fairly present" all of his claims to the state court.  *Picard v. Connor*,

404 U.S. 270, 275 (1971). In Texas, all claims must be presented to and ruled upon the merits by the TCCA. *Richardson v. Procunier*, 762 F.2d 429, 432 (5th Cir. 1985). When a petition includes claims that have been exhausted along with claims that have not been exhausted, it is called a "mixed petition," and historically federal courts in Texas have dismissed the entire petition for failure to exhaust. *See, e.g., Galtieri v. Wainwright*, 582 F.2d 348, 355 (5th Cir. 1978) (en banc).

The Director's argument that the present ground for relief is unexhausted and procedurally barred brings into play the procedural default doctrine that was announced by the Supreme Court in *Coleman v. Thompson*, 501 U.S. 722 (1991). The Court explained the doctrine as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Id.* at 750. As a result of *Coleman*, unexhausted claims in a mixed petition are now dismissed as procedurally barred. *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir.), *cert. denied*, 515 U.S. 1153 (1995). *See also Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). Such unexhausted claims would be procedurally barred because if a petitioner attempted to exhaust them in state court they would be barred by Texas abuse-of-the-writ rules. *Fearance*, 56 F.3d at 642. The Fifth Circuit has held that the procedural bar contained in Tex. Code Crim. Proc. Ann art. 11.071 § 5 is an adequate state ground for finding procedural bars in light of decisions by the Texas Court of Criminal Appeals. *Ibarra v. Thaler*, 691 F.3d 677, 684-85 (5th Cir. 2012); *Balentine v. Thaler*, 626 F.3d 842, 856-57 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 2992 (2011). The procedural bar may be overcome by demonstrating either cause and prejudice for the default or that a fundamental miscarriage of justice would result from the court's refusal to consider the claim. *Fearance*, 56 F.3d at 642 (citing *Coleman*, 501 U.S. at 750-51).

Until just recently, Petitioner's second ineffective assistance of counsel claim would have been foreclosed as unexhausted and procedurally barred. However, the Supreme Court opened the door slightly for a showing of cause and prejudice to excuse the default in *Martinez* and *Trevino*. In *Martinez*, the Supreme Court answered a question left open in *Coleman*: "whether a prisoner has a right to effective counsel in collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial." 132 S. Ct. at 1315. These proceedings were referred to as "initial-review collateral proceedings." *Id.* The Court held:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance of counsel at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Id.* at 1320. The Supreme Court specified that the standards of *Strickland* apply in assessing whether initial-review habeas counsel was ineffective. *Id.* at 1318.

The Supreme Court extended *Martinez* to Texas in *Trevino*. Although Texas does not preclude appellants from raising ineffective assistance of trial counsel claims on direct appeal, the Court held that the rule in *Martinez* applies because "the Texas procedural system - as a matter of its structure, design, and operation - does not offer most defendants a meaningful opportunity to present a claim of ineffective assistance of trial counsel on direct appeal." *Trevino*, 133 S. Ct. at 1921. The Court left it to the lower courts to determine on remand whether Trevino's claim of ineffective assistance of counsel was substantial and whether his initial state habeas attorney was ineffective. *Id.*

The Fifth Circuit has summarized the application of the rule announced in *Martinez* and *Trevino* as follows:

> To succeed in establishing cause to excuse the procedural default of his ineffective assistance of trial counsel claims, [petitioner] must show that (1) his underlying claims of ineffective assistance of trial counsel are "substantial," meaning that he "must demonstrate that the

claim[s] ha[ve] some merit," *Martinez*, 132 S. Ct. at 1318; and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. *See id.*; *Trevino*, 133 S. Ct. at 1921.

*Preyor v. Stephens*, 537 F. App'x 412, 421 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 2821 (2014). "Conversely, the petitioner's failure to establish the deficiency of either attorney precludes a finding of cause and prejudice." *Sells v. Stephens*, 536 F. App'x 483, 492 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1786 (2014). The Fifth Circuit subsequently reaffirmed this basic approach in *Reed v. Stephens*, 739 F.3d 753, 774 (5th Cir.), *cert. denied*, 135 S. Ct. 435 (2014).

In the present case, Cortez alleges that his trial counsel was ineffective for failing to interview or investigate Jake Joplin and his writ counsel was ineffective in the state habeas proceedings for failing to develop the record on this point. As was previously noted, the Fifth Circuit "has repeatedly held that complaints of uncalled witnesses are not favored in federal habeas review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative." *Day*, 566 F.3d at 538; *Bray v. Quarterman*, 265 F. App'x 296, 298 (5th Cir. 2008). To prevail on an ineffective assistance of counsel claim for failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness' proposed testimony, and show that the testimony would have been favorable to a particular defense. *Day*, 566 F.3d at 538; *Bray*, 265 F. App'x at 298; *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985). Such complaints are not favored because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative. *Boyd v. Estelle*, 661 F.2d 388, 390 (5th Cir. 1981).

The Director appropriately observed that the presumption is not that state habeas counsel's performance fell below constitutional standard but rather that his failure to pursue this line of inquiry

was reasonable. *Richter*, 562 U.S. at 104. *See also Strickland*, 466 U.S. at 690 (a court must generally presume that counsel has exercised reasonable professional judgment). There is a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id.* The Director argues that Cortez offers nothing to rebut the presumption.

In addition to the foregoing, Cortez offers nothing to show that the investigators failed to check out Joplin's story. He offered nothing other than conclusory allegations and bald assertions, which are insufficient to support a petition for a writ of habeas corpus. *See Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir.), *cert. denied*, 531 U.S. 849 (2000); *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990); *Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir. 1983). Furthermore, it may well be that the investigators did contact individuals at Cliff's or perhaps the nearby doughnut shop to follow up on Joplin's statement. Investigators may well have found that the statement led to a dead end.

The only evidence that Cortez offers is Joplin's statement made to the police, along with an affidavit that "no one from Raul Cortez's defense team ever contacted [him] o[r] followed up with me regarding my statement to police." *See* Petition, exhibit 4. Joplin's affidavit does not, however, show that he would have been available to testify at trial or would have done so. The Director appropriately observed that it does not address how his testimony would have held up under cross-examination. Defense counsel may well have wanted to avoid Joplin's testimony. *See Boyd*, 661 F.2d at 390.

This potential defense must also be viewed in light of other evidence known to defense counsel. Joplin's statement supports an inference that four black men were acting suspiciously, but nothing more. By comparison, investigators were able to connect the Cortez brothers to the murders through Williams' testimony, the DNA on the portion of plastic gloves found on Rosa Barbosa, and the slugs found in the ceiling of the Kentucky Street house and the bodies of the victims. In light of the known evidence, Joplin's statement was of little value. It was an appropriate lead at first, but the

lead became insignificant once all of the other evidence came to light. Cortez has not shown that trial counsel's performed below an objective standard of reasonableness with respect to this issue. Furthermore, even if deficient performance is assumed, he has not shown that such deficient representation prejudiced him by anything contained in Joplin's statement.

Overall, Cortez's ineffective assistance of counsel claim based on Jake Joplin's statement is unexhausted. He failed to overcome the procedural default by showing that (1) his underlying claims of ineffective assistance of trial counsel are substantial, and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. Thus the claim is procedurally defaulted.

### C.     Failure to interview or investigate John Brown

Cortez next alleges that trial counsel was ineffective for failing to investigate or interview his roommate, John Brown. He notes that Brown talked to McKinney police on the day after he was arrested. Brown told the police that he was with him at the time of the murders. Cortez asserts that Brown would have testified that Cortez was with him during the time of the murders between 7:40 p.m. and 10:00 p.m. on March 12, 2004. Cortez stresses that trial counsel never interviewed Brown and, instead, decided that he was not helpful solely on a recorded interview Brown gave to the police.

The issue of whether defense counsel was ineffective with respect to the prospect of using John Brown as a witness was fully developed during the state habeas corpus proceedings. The evidence reveals that he was interviewed by the State on multiple occasions. The first piece of evidence is a DVD of an interview between Brown and McKinney Police Detectives Janio Lee and Randy Norton on July 20, 2007.[2]  Brown stated that, on the day of the murders, he was working in

---

[2]The DVD has been supplied to the Court.

Lubbock and left work about 5 p.m. He could not remember exactly when he left. He said a 5 p.m. departure would have put him into McKinney at about 11:30 to midnight. The Director observed that the distance between Lubbock and McKinney is 324 miles. Brown added, however, that his supervisor may have permitted him to leave earlier about 2 p.m. He was not sure when he left Lubbock. He was stopped by a highway patrolman for speeding west of Olney, at about 4:30 p.m. to 5 p.m. The Director observed that the distance between Olney and McKinney is 132 miles with a traveling time of two hours and sixteen minutes.

Brown specified that he saw Cortez that weekend, and Cortez behaved normally. Brown told police that both Cortez and his brother grew marijuana for personal use, that he had seen Cortez with a silver colored handgun and a sawed off shotgun, that Cortez had a short temper and once got into a fight with a man over a parking spot. Brown told police that a former housemate, Luis Torres, had moved out of the Kentucky Street house in McKinney because he was afraid of Cortez.

Brown stated that when he heard the news that Cortez had been arrested for the murders, he was not surprised. He expressed the opinion that Cortez would have been the mastermind.

Brown stated that he did not go directly to the Kentucky Street address where he and Cortez lived upon his arrival in McKinney; instead, he went to see his daughter. At one point in the interview, he said he was "fuzzy" as to whether he arrived in McKinney on Friday or Saturday, but he arrived around 9 p.m. He thought he left Lubbock about 2 p.m. and agreed that he could have arrived at McKinney around 7 or 8 p.m. When he arrived at the Kentucky Street house it was dusk, and he was using his headlights. Later in the interview, he stated he went first to the Kentucky Street address and picked up some clothes and then went to see his daughter. He said he spent the night at his uncle's house and met Cortez the following morning at the home of Cortez's parents.

Elsewhere in the interview, Brown said he went to the Kentucky Street house on Friday evening to pick up clothes. He was fifty percent certain that he saw Cortez there. He said he did not see Javier there, but later said, "You know, I think Javier was there." He said he and Cortez and Javier chatted for a few minutes, and then all three of them went into the house. He finally told investigators that "Raul [Cortez] scares me."

A second piece of evidence was a DVD of a telephone interview between Brown and McKinney Police Detective Diana Tilton on November 15, 2007. Brown told Tilton that both Cortez and his brother, Javier, were a little "off their rocker." He added that they "just weren't normal everyday citizens." He again stated that he was not surprised when he learned that Cortez was possibly connected to the murders.

Another piece of evidence was a letter from Brown, dated July 29, 2009, to Cortez in prison. He informed Cortez that he had been questioned by investigators. He said he told them that they had partied on the night in question. Brown told Cortez that if he was allowed visitors, he would like to visit him. He also told Cortez that he and his family thought Cortez has gotten "shafted."

A fourth piece of evidence was an affidavit from Brown, dated May 24, 2011. In the affidavit, he said that Cortez was with him at the time of the murders. In the affidavit, he stated that he was stopped in Olney at 1:57 p.m. After receiving the ticket, he continued to McKinney, about two to two and one-half hours away. He specified that he was not sure when he arrived at his house in McKinney, but Cortez and Javier were there when he arrived. "Once I arrived, Raul and I were in each other's presence the entire night." He stated that he was never contacted by Cortez's defense team, and while he was sworn in as a trial witness, he was never called to testify. He said if he had been called to testify, he would have related the facts contained in the affidavit.

Another piece of evidence was a DVD of an interview between Brown and Collin County District Attorney Investigator J. D. Spielman on April 20, 2012. They discussed the apparent discrepancies between Brown's affidavit and his previous interviews. Brown told Spielman that he had spoken with a defense investigator over the phone. Later, the investigator showed up at his job site with a typed statement from the telephone conversation. Brown stated that he did not intend to mislead anyone.

With all of this evidence in mind, Brown testified at the state writ evidentiary hearing. 3 SHRR 97-106, 149-216. The ticket, which was barely legible, bears a time of 4:57 a.m. 4 SHRR 4-5. He said "okay" when it was noted that the ticket shows that he was stopped at approximately 5:00 p.m. 3 SHRR 101. He testified that it was dark when he arrived in McKinney. *Id.* Cortez, his brother Javier and "an African American gentleman" were there when he arrived. *Id.* With respect to the statement in his affidavit that he stayed with Cortez, he testified that he was referring to Friday night. *Id.* at 103. He stated that if he had testified during the actual trial, he would have testified that he "arrived in McKinney at some point that night and [he] wouldn't have picked [his] daughter up until the next morning." *Id.* at 104. Upon his arrival, Javier and another person were there five to ten minutes, and then they left. *Id.* He added that Cortez was there the rest of the night, and they smoked weed. *Id.* at 105. Brown specified that he was not contacted by the defense team. *Id.* at 159. Nonetheless, if he had been contacted and had testified, he would have stated that he drove from Lubbock to McKinney on March 12, 2004. *Id.* at 160. He agreed that it was dark when he arrived, around 9:00 o'clock, and testified that he "had a hard time swallowing the fact that people [he] knew would be part of that." *Id.* at 161.

On cross-examination, Brown acknowledged that his statements to the police made Cortez sound like a "cold-blooded person." *Id.* at 163. He testified that Cortez, at times, made him "feel like

he didn't have a conscience." *Id.* With respect to his statement that Cortez probably was the mastermind, he explained that he did not think that Cortez "would have been following directions from somebody else." *Id.* He reiterated that he traveled from Lubbock to McKinney to see his daughter. *Id.* at 165. He did not see his daughter that night because he thought it was "too late that night to go and wake up a four year-old at 9:00 or 10:00 o'clock at night." *Id.* at 166. He discussed the time line and again testified that he believes that he arrived at the house in McKinney at 9 or 10 o'clock. *Id.* at 169. His basic recollection was summed up as follows: "I remember coming home that night, it was dark, and they were -- I saw Raul and Javier in the driveway and I talked to him a few minutes, and I remember him getting in his car and leaving and I remember me and Raul going inside." *Id.* at 171. He testified that he did not want to be a part of the trial and did not want to be an alibi witness. *Id.* at 192. He acknowledged that if defense counsel had talked to him "it wouldn't have changed." *Id.* at 193. He would have testified, but he did "not know what [Cortez] did or didn't do that night." *Id.* He testified that he got into an argument with the prosecutor during the punishment phase of the trial because he did not want to testify against Cortez. *Id.* at 208.

Defense attorney John Tatum testified as to why he did not call Brown as a witness. He testified that he watched the 2007 police interview of Brown. 2 SHRR 82. He was able to make his decision not to call Brown based solely on watching the interview. *Id.* at 83. He testified that Brown "would have made a terrible witness, horrible witness. He was fearful of Mr. Cortez, he kept talking about being confused. He couldn't nail down the hours particularly." *Id.* at 84. Tatum stated that he counseled with Cortez about calling Brown as a witness. "If he had insisted on calling that gentleman as a witness we would have called him. We would have put on the record why and we would have disagreed, but I think it's arguable that it would have been ineffective assistance in putting him on without talking to the defendant." *Id.* at 84-85. After discussing the matter, they decided that it would

not be a good idea to call Brown as a witness. *Id.* at 87. He also observed that Brown's statements in his interview were inconsistent with his affidavit. *Id.* at 91. He added that Brown "was scared to death. He thought he was being sucked into this investigation. I can't tell you what he would have said at trial." *Id.* He also noted that Brown's interview included damaging information, such as Cortez's membership in the Latin Kings gang, his ownership of guns and the possibility that he was the mastermind of the murders. *Id.* at 94. He testified that he thought that Brown "was a material witness that needed to be investigated," but he could not recall whether they actually talked to him because "the interview itself causes a lot of concern." *Id.* at 96-97.

Co-counsel Doug Parks testified that the defense team did not regard "Brown as being particularly important at all." 2 SHRR 48. He noted that the defense team had "some real problems with John Brown." *Id.* He did not think that Brown would have provided an alibi after watching the video. 3 SHRR 9-10. He explained that Brown was never very clear. *Id.* at 10. He added that Brown "had very little to offer by way of help to Mr. Cortez, and he could have done a great deal of harm." *Id.* Parks testified that he would not have been comfortable placing Brown on the stand "for the little bit of potential good he might have been able to do." *Id.*

Co-counsel Richard Franklin testified that he recalled the recorded police interviews and concluded that Brown would not provide an alibi. 2 SHRR 59-60. He testified that Brown "would have been dynamite to put on the witness stand. You wouldn't know exactly where he was going to go, you wouldn't have known what doors he was going to open. And again, he is the only living human being who could put Cortez in McKinney on the day of the murders, which seems to me like you're proving up the State's case for them if you're putting him here at the time that nobody else can even put him close to McKinney at the time of the murders." *Id.* at 61-62.

After collecting all of the evidence and listening to the testimony of the witnesses, the state trial court issued 112 findings spanning nineteen pages with respect to this particular claim. 3 SHCR 650-669. With respect to the November 15, 2007 interview, the state trial court found that "Brown was not surprised when the police asked him about [Cortez]" and that he "did not want to testify, and he was concerned that there would be too many repercussions against his family." 3 SHCR 651.

With respect to Brown's letter to Cortez, the state trial court found that Brown lied to Cortez when he told him that the police had brought him in for questioning since Brown initiated his contact with police. *Id.* The state trial court further found that Brown lied to Cortez about thinking Cortez "got 'shafted' since Brown previously told the police on numerous occasions that it would not surprise him if [Cortez] committed the murders." *Id.* at 651-52.

With respect to Brown's testimony at the writ hearing, the state trial court found that "[a]s Brown admitted, he does not have a very good memory." *Id.* at 654. "At the time of [Cortez's] trial, Brown's memory would not have been trustworthy." *Id.* About his return from Lubbock, Brown testified it was dark when he arrived in McKinney. *Id.* at 655. The state trial court further found that he testified that "he went straight to [Cortez's] house, and [Cortez], Javier, and a black man were at the house, standing in the driveway." *Id.* The state trial court found that Brown testified that they all talked for five or ten minutes, and then Javier left with the black man. *Id.* Brown then testified that he and Cortez smoked marijuana and "he then went to bed or passed out, which are basically the same thing to him." *Id*. at 656. The state trial court found that Brown conceded that "he does not actually know what he did the night of March 12." *Id.* The state trial court included numerous findings about Brown having a poor memory of events and how he had lied at times. The state trial court found that if "Brown had testified at [Cortez's] trial, he would have provided testimony damaging to [Cortez's]

case." *Id.* at 658. Brown's "testimony would have supported the notion that [Cortez] was a heartless and remorseless killer and that he would have be a future danger." *Id.* at 659.

The state trial court proceeded to issue specific findings on Cortez's claim that the defense attorneys' representation was deficient for failing to investigate Brown as an alibi witness, which included the following:

284. [Cortez's] counsel were not deficient for failing to investigate Brown as an alibi witness.

285. [Cortez] did not inform his trial counsel that Brown was an alibi witness.

287. Since [Cortez] failed to tell his counsel that Brown was an alibi witness, his counsel were not deficient for failing to investigate Brown as an alibi witness. *Cannon*, 668 S.W.2d at 402-403.

289. Additionally, based on Brown's July 20, 2007 police interview, it was reasonable for counsel to have decided not to investigate Brown as a possible alibi witness.

290. Prior to trial, [Cortez's] counsel reviewed the videotape of Brown's July 20, 2007 police interview. []

291. [Cortez's] counsel could decide whether to investigate and call Brown to testify based on the videotape alone, and they did not need a hard copy of Brown's speeding ticket to make that decision. []

293. Brown's statements in his police interview establish that he could not provide [Cortez] with alibi for the instant murders.

294. Further, throughout his police interview, Brown accepted the fact that [Cortez] committed the murders - even saying [Cortez] was probably the mastermind - and Brown's acceptance of [Cortez's] guilt is inherently inconsistent with Brown being an alibi witness. []

295. Without any contrary information from [Cortez], it would have been unreasonable for [Cortez's] counsel to have ignored Brown's unequivocal statements and nevertheless suspect that Brown was, in fact, an alibi witness.

302. [Cortez's] counsel were not deficient for failing to anticipate that Brown would have changed his story from what he told police in his July 20, 2007 police interview. *See Harrington v. Richter*, 131 S. Ct. 770, 791 (2011) (holding that lower court erred in suggesting that counsel must be prepared for "any contingency" and noting, "Just as

there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for . . . failing to prepare for what appear to be remote possibilities").

304. Based on Brown's July 20, 2007 police interview, [Cortez's] counsel did not consider Brown to be a potential alibi witness. [] Counsel's assessment was accurate and reasonable.

306. [Cortez's] counsel were not deficient for failing to investigate Brown as an alibi witness when Brown's police interview showed he was *not* an alibi.

3 SHCR 659-662 (some citations omitted as indicated by brackets).

The state trial court then proceeded to issue findings on Cortez's claim that his defense attorneys' representation was deficient for failing to call Brown as an alibi witness, which included the following findings:

307. Additionally, [Cortez's] counsel were not deficient for failing to call Brown to call Brown to testify at trial.

308. Based on Brown's July 20, 2007 police interview, [Cortez's] counsel determined that Brown would have been an unpredictable witness who knew highly damaging information about [Cortez] and was thus a potentially dangerous witness. [] Counsel's determination was accurate and reasonable.

310. Further, Brown's testimony would have put [Cortez] at the very house Williams said he was at, and Brown's testimony would have put [Cortez] with Javier, both at about the time the murderers would have left for Rosa's. [] [Cortez's] counsel did not know of any other witness who could have placed [Cortez] in McKinney at the time of the murders. [] By calling Brown to testify, counsel would have been helping the State prove its case. [] It was reasonable for counsel to decide not to call a witness who would have helped the State prove its case.

311. Based on the reasonable assumption that Brown would have testified in accordance with his police interview, [Cortez's] counsel weighed Brown's possible testimony that he was at [Cortez's] house on March 12 for about ten minutes against the potential harmful testimony. [] Counsel concluded that Brown's value as a possible alibi witness was de minimus and he could potentially have done a great deal of harm to [Cortez's] case. On balance, counsel determined that the potential damage created too much risk to consider using Brown as an alibi witness. [] Counsel's determination was accurate and reasonable.

316.     [Cortez's] membership in the Latin Kings gang, and other evidence of [Cortez's] bad acts and character, would not have otherwise been known to the jury during the guilt/innocence stage of the trial.

318.     At the same time, even if Brown had testified in accordance with his writ affidavit and writ hearing testimony, Brown would not have provided [Cortez] with an alibi.

320.     But even based on his own estimations under his new version of events, he would have arrived in McKinney between 9:00 and 9:30 p.m.

321.     The murders took place either between 7:30 and 8:30 p.m. or between 8:45 and when the alarm went off at Cliff's Check Cashing at 8:53 p.m.

323.     Since Brown cannot render it a physical impossibility that [Cortez] could have committed the murders, he does not provide [Cortez] with an alibi.  []

325.     [Cortez's] counsel's decision not to call Brown as a witness was also based on their conversations with [Cortez].

327.     For all these reasons, [Cortez's] trial counsel were not deficient for failing to investigate Brown as an alibi witness and then call him to testify as an alibi witness.

3 SHCR 663-68  (some citations omitted as indicated by brackets).

The state trial court went on to find that Cortez was not prejudiced by counsel's representation with respect to Brown.  *Id.* at 668.  The finding was made that Brown was not credible and that the jury would not have found him credible.  *Id.*  The state trial court also found that the jury would not have given any weight to Brown's testimony.  *Id.* at 669.

The state trial court finally found that Cortez failed to satisfy his burden of proving both the deficiency and prejudice prongs of *Strickland*.  *Id.*  Moreover, a finding was specifically made that "trial counsel did not render ineffective assistance of counsel by failing to investigate Brown as an alibi and then call him to testify."  *Id.*  A recommendation was made to deny relief on this claim.  The Texas Court of Criminal Appeals subsequently denied relief based on the trial court's findings and conclusions and its own review.  *Ex parte Cortez*, 2013 WL 458197, at *1.

In evaluating this ground for relief, the Court again notes that "complaints of uncalled witnesses are not favored in federal habeas review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative." *Day*, 566 F.3d at 538; *Bray*, 265 F. App'x at 298. The Supreme Court fully discussed "counsel's duty to investigate" in *Strickland*, 466 U.S. at 690. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all of the circumstances, applying a heavy measure of deference to counsel's judgment." *Id.* "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Id.* "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigations are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91.

In the present case, Cortez's attorneys, in fact, investigated the possibility of calling Brown as a witness. Defense Counsel Tatum reviewed the 2007 police interview of Brown. 2 SHRR 82. He was able to make his decision not to call Brown based solely on watching the interview. *Id.* at 83. He testified that Brown "would have made a terrible witness, horrible witness. He was fearful of Mr. Cortez, he kept talking about being confused. He couldn't nail down the hours particularly." *Id.* at 84. Moreover, the interview revealed Brown potentially would have provided very damaging testimony. Co-counsel Parks observed that he would not have been comfortable placing Brown on the stand "for the little bit of potential good he might have been able to do." 3 SHRR 10.

As was previously explained on page sixteen of this memorandum opinion, an informed decision to forego presenting "double-edged" evidence is a reasonable trial strategy. *Hopkins*, 325 F.3d at 586 ("[T]his Court has repeatedly denied claims of ineffective assistance of counsel for failure to present 'double edged' evidence where counsel made an informed decision not to present it."); *Mann v. Scott*, 41 F.3d 968, 984 (5th Cir.) (noting the heavy measure of deference owed trial counsel when deciding as a strategical matter to forego admitting evidence of a 'double-edged nature' which might harm defendant's case), *cert. denied*, 514 U.S. 1117 (1994). Furthermore, the Fifth Circuit has denied ineffective assistance of counsel claims for lack of prejudice due to the double-edged nature of the evidence. *See Gray v. Epps*, 616 F.3d 436, 449 (5th Cir. 2010) (Petitioner "cannot show prejudice because much of the new evidence is 'double edged' in that it could also be interpreted as aggravating."), *cert. denied*, 563 U.S. 905 (2011); *Miniel v. Cockrell*, 339 F.3d 331, 346-48 (5th Cir. 2002) (upholding the state court's conclusion that petitioner suffered no prejudice from counsel's failure to investigate and present evidence of abuse and neglect during childhood), *cert. denied*, 540 U.S. 1179 (2004). Counsel's informed decision in this case to forego calling Brown as a witness due to the double-edged nature of his anticipated testimony was reasonable trial strategy.

In addition to the foregoing, consistent with the Supreme Court's instructions in *Strickland*, defense counsel discussed with Cortez whether to call Brown as a witness, and they agreed that Brown should not be called as a witness. Counsel's informed decision to forego calling Brown as a witness, coupled with Cortez's agreement on this matter, was the very opposite of deficient representation. It was exemplary representation. Counsel's conduct on this matter simply did not fall below an objective standard of reasonableness. Cortez has not shown that his counsel's representation on this issue was deficient or that he was prejudiced by his attorneys' representation on this issue. The third ineffective assistance of trial counsel claim lacks merit.

The claim should be denied for the additional reason that Cortez has not shown, as required by 28 U.S.C. § 2254(d), that the State court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. Finally, he failed to overcome the doubly deferential standard that must be accorded to counsel in the context of § 2254(d); thus, he is not entitled to federal habeas corpus relief on his third ineffective assistance of counsel claim.

**D.      Failure to object to polygraph evidence**

In his fourth ineffective assistance of counsel at trial claim, Cortez complains that his attorneys did not object to polygraph evidence. He stresses that under Texas law, testimony regarding the existence of a polygraph examination is inadmissible. *Tennard v. State*, 802 S.W.2d 678, 684 (Tex. Crim. App. 1990), *cert. denied*, 501 U.S. 1259 (1991). Moreover, the results of polygraph examination are always inadmissible. *Martinez v. State*, 272 S.W.3d 615, 626 (Tex. Crim. App. 2008), *cert. denied*, 558 U.S. 931 (2009); *Crawford v. State*, 617 S.W.2d 925, 930 (Tex. Crim. App.), *cert. denied*, 452 U.S. 931 (1981). Cortez argues that this has been the law in Texas for decades, and the Texas Court of Criminal Appeals has never waivered on this issue. The Director, in response, argues that counsel acted reasonably in deciding not to object to this evidence.

The record reveals that polygraph examinations were mentioned several times during the trial. On three occasions, law enforcement officers testified that other suspects were excluded because of the results of polygraph examinations. Texas Ranger Sgt. A. P. Davidson testified that they "couldn't corroborate anything at all [James Jones] told us, so we had him polygraphed." 36 RR 243. McKinney Police Department Det. Steve Riley likewise testified that James Jones was no longer

35

considered a suspect because of the results of polygraph examinations. 38 RR 128-29. Det. Riley also testified that Daniel Guajardo was eliminated as a suspect because of a polygraph examination. *Id.* at 156-58. He further testified that the police administered polygraph examinations to Robert Barbosa and Beau Kidd. *Id.* at 41. Robert Barbosa was the person who found his family members murdered, and Beau Kidd was with him at the time. Det. Riley added that he never really thought that Robert Barbosa or Beau Kidd had anything to do with the murders, but they still decided to have them polygraphed. *Id.* McKinney Police Department Det. Diana Tilton subsequently testified that Eddie Williams was polygraphed, although she did not specifically discuss the results of the test. 44 RR 125-26. The defense never objected to any of this testimony.

The issue before the Court is not whether the evidence of the polygraph examinations was inadmissible. Instead, the question is whether Cortez's attorneys were ineffective for failing to object to such evidence. The issue was fully developed during the state writ evidentiary hearing. Defense Counsel Doug Parks was the first person to be questioned about this issue. Parks noted that he had tried "maybe upwards of 20 or 25 capital murder cases where the State sought death." 2 SHRR 34. He specified that he typically would object to questions about polygraph examinations. *Id.* at 38. Nonetheless, he chose not to object in this case. He provided the following explanation:

> Well, it was my witness when it happened, and I had to make a decision what to do about that, and I had to make the decision right then. . . .
>
> The problem that we had here, as I saw it, and the ultimate goal we had here was going to be whether or not the jury believed Mr. Cortez when he testified, because we had three major problems with the case. We had the bullet in the ceiling, we had Edd[ie] and we had peripherally where the truck was found.
>
> If it weren't for the other two things that wouldn't be particularly important, but in conjunction with those other two things, those things seemed to be major hurdles that we had. And I think that -- well, I don't think, I know that we had to put our best foot forward with the jury as far as credibility was concerned, and I had a decision to make. Do I make a big issue out of this, do I object to it, make it seem like it's something that is more important than it is

or do I just let it go, cross on the fact that it's not reliable, and not seem like we were trying to stand between the jury finding out the truth or whatever.

And you know in hindsight, you know, certainly I can understand being criticized for having done that, but I did it because I thought that was the best thing to do at the time.

*Id.* at 38-39. He specified that he probably thought about filing a motion in limine to prevent similar statements from being volunteered by witnesses, but he did not "remember any specific discussion about it." *Id.* at 39. He noted that "[s]ome of them that they gave polygraphs to we never intended to try to point a finger at. There was no reason to." *Id.* at 40. Thus, there was no reason to make an issue of the results of their polygraph examinations. He acknowledged that everyone knows that the results of polygraph examinations are not admissible, but "[he] did what [he] did with [his] witness because [he] thought that that was the best way to handle it at the time." *Id.* at 41. On cross-examination, Parks was asked why there was no objection to testimony about Eddie Williams passing a polygraph, and he stated that he had no explanation "other than we hadn't been doing it before." *Id.* at 44.

Co-counsel Richard Franklin was likewise questioned about the failure to object to the evidence concerning the polygraph examinations. He testified that he had handled "68 capital murder cases and tried ten for death and eight got the death penalty." 2 SHRR 52. He testified that the defense team did not discuss how they should handle polygraphs prior to Davidson's reference to the polygraph examination of James Jones. *Id.* at 55. He provided the following assessment of the polygraph evidence:

I think that popped up and I think that [Parks] made a judgment call.

I don't disagree with it.

I think that the overall scheme of things was to make the police look bad, to let the police hang themselves, and they were doing a pretty good job of it and did so for several years.

37

So when that stuff came in I didn't -- it didn't upset me because I thought well, in the big scheme of things it's okay, and we were letting that investigation just kind of play out itself.

It was a terrible investigation and it didn't bother me that that happened, but that was not my witness.

*Id*. Franklin further explained that the evidence was not harmful in the sense that it was a defense strategy to create some reasonable doubt in the mind of the jury that perhaps these alternate suspects may have been involved. *Id.* at 56. He added that no decision was ever made to file a motion in limine regarding these suspects taking and passing polygraph examinations. *Id.*

Defense counsel John Tatum acknowledged that five different people were given polygraph exams. 2 SHRR 71-72. He testified that he was surprised by the prosecutor's question that led to Davidson's response. *Id.* at 73. He was surprised since the evidence was inadmissible and the prosecutor, with all of his experience, "felt he needed to ask that question." *Id.* Nonetheless, the evidence was beneficial to the defense since it "allowed the other attorneys to continue to attack the investigatory techniques in some sense of how shotty of a investigation it was." *Id.* He reiterated that it was not a trial strategy to allow polygraph evidence into the record, but, once in, it was helpful with respect to "one of [his] main defensive theme [that] the McKinney police had been inept." *Id.* at 74. It also furthered the theme that Det. Riley had "used investigative techniques that were a little bit unreliable." *Id.* He added that "it wasn't an overwhelming factor as far as strategy, but once it was there the idea was to try to be as forthcoming as possible since we knew pretty much the strategy was that a lot was going to hinge on the defendant testifying." *Id.* Tatum testified that the defense team did not want to look like "obstructionists" and they were "trying to make the best impression to the jury, because [they] wanted them to believe Mr. Cortez." *Id.* at 78.

After collecting all of the evidence and listening to the testimony of the witnesses, the state trial court issued 147 findings spanning sixteen pages with respect to this particular claim. 3 SHCR 625-40. The state trial court began with the finding that "[g]enerally, polygraph evidence is inadmissible in a Texas criminal proceeding," but "counsel are not necessarily deficient for choosing not to object to inadmissible evidence." 3 SHCR 625. The state trial court cited a number of published opinions in observing that the failure to object to inadmissible evidence can be part of a reasonable trial strategy. *Id.* It was further noted that it "can be sound trial strategy to avoid objecting to inconsequential testimony to avoid the risk of antagonizing the jury." *Id.*

With these basic principles in mind, the state trial court observed that the defense attorneys' "primary defense strategy was to gain credibility with the jury so the jury would believe [Cortez] when he testified at the guilt/innocence stage of trial." *Id.* at 626. Thus, "counsel made the decision not to object to testimony about polygraph examinations, to avoid appearing to the jury like counsel were trying to prevent the jury from hearing the truth." *Id.* The state trial court found that the "defense strategy was reasonable, and the strategy was supported by their decision not to object to testimony about polygraph examinations." *Id.*

The state trial court further found that defense counsel pursued a reasonable theme that the police were inept in their investigation and that "early in the investigation the police had wrongly arrested multiple suspects who they later determined were not involved in the murders." *Id.* It was noted that if counsel had made too many objections, then "the jurors may have thought that the police investigations appeared inept only because [Cortez's] counsel were preventing them from hearing about the full investigation." *Id.* Consequently, from the evidence, "the jurors could have agreed with [Cortez's] defense that the police were generally inept in their investigation of the murders and therefore had wrongly arrested [Cortez] as well." *Id.*

The state trial court also found that counsel elicited testimony that polygraph results are subjective, unreliable, and inadmissible at trial, and the state trial court found that it "was also reasonable strategy for [Cortez's] counsel to allow the jury to hear that the police used a subjective, unreliable tool in their investigation." *Id.* at 627. Moreover, such testimony would have supported the "defense that the police investigation was inept because the jury could have concluded that the police used a subjective, unreliable investigative tool." *Id.*

The state trial court further found that it was "reasonable strategy for [Cortez's] counsel to choose not to object to the testimony about the polygraph examinations because the testimony was inconsequential." *Id.* The "testimony was inconsequential compared to the other evidence that compelled the same conclusion." *Id.*

The state trial court found that counsel were aware that making objections to insignificant testimony may antagonize a jury and negatively affect a defendant. *Id.* As such, since Cortez planned to testify at trial, "it was particularly reasonable for [his] counsel to be concerned with how their objections would affect the jury's view of [him]." *Id.*

The trial court specifically found that Cortez's attorneys were not deficient for failing to object to polygraph related evidence in connection with other suspects. *Id.* at 628. The trial court initially discussed the evidence involving James Jones and concluded that such evidence shows that he was not credible and had not killed the victims in this case. Consequently, the state trial court found that the outcome of the "trial would not have been different if [Cortez's] counsel had objected to the testimony that Jones took polygraph examinations." *Id.* at 631. The trial court accordingly found that Cortez "was not prejudiced by his counsel's failure to object to testimony that Jones took polygraph examinations. *See Stewart v. State*, 705 S.W.2d 232, 234 (Tex. App. - Texarkana 1986, pet. ref'd) (concluding that testimony indicating that suspect other than defendant took a polygraph examination

was harmless due to other evidence showing why that other person was cleared as a suspect)." *Id.* at 631-32.

The trial court proceeded to discuss the evidence surrounding witnesses Robert Barbosa and Beau Kidd, who discovered the bodies. They were found to be credible. *Id.* at 632-33. The trial court found that the jury heard that police administered polygraph examinations to them. *Id.* at 633. The trial court further found that counsel did not object to testimony that the police administered polygraph examinations to Barbosa and Kidd. *Id.* Even without the testimony about the polygraphs, the jury would have believed that they were not involved in the murders. *Id.* at 633-34. The trial court specifically found that even without the testimony that Barbosa and Kidd took polygraph examinations, and even if counsel had objected to that testimony, the jury would have convicted Cortez of capital murder and sentenced him to death. *Id.* at 633-34. The trial court thus found that Cortez was not prejudiced by counsel's failure to object to testimony that Barbosa and Kidd took polygraphs examinations nor prejudiced by the failure to object to testimony stating or implying the results of the polygraph examinations. *Id.* at 634-635 (citing *Stewart*, 705 S.W.2d at 234).

The trial court conducted a similar analysis of the testimony of Daniel Guajardo. *Id.* at 635-38. The trial court found that he had no connection to the murders, that his different versions of the murders were inconsistent and that he was not credible. *Id.* at 636. The trial court found that the jury heard testimony that Guajardo took a polygraph examination and that police eliminated him as a suspect after they learned about the results of the polygraph examination. *Id.* at 636-37. The trial court found that counsel did not object to testimony concerning the police administering a polygraph examination to Guajardo; nonetheless, even if counsel had objected, the jury would have found that Guarjardo was not involved in the murders. *Id.* at 637. The trial court thus found that Cortez was not prejudiced by counsel's failure to object to testimony that Guarjardo took polygraphs examinations nor

41

prejudiced by the failure to object to testimony stating or implying the results of the polygraph examinations. *Id.* at 637-38 (citing *Stewart*, 705 S.W.2d at 234).

The trial conducted a similar analysis of the testimony by Eddie Williams. *Id.* at 638-40. The trial court found that his testimony about his involvement in the murders was corroborated by other evidence. *Id.* at 638. He was found to be a credible witness, and his testimony was found to be true. *Id.* The court found that the jury heard testimony that Williams took a polygraph examination. *Id.* The trial court found that counsel did not object to testimony concerning the police administering a polygraph examination to Williams; nonetheless, even if counsel had objected, the jury would have found Williams' testimony to be credible and would have convicted Cortez and sentenced him to death. *Id.* at 639. The trial court thus found that Cortez was not prejudiced by counsel's failure to object to testimony that Williams took polygraphs examinations nor prejudiced by the failure to object to testimony stating or implying the results of the polygraph examinations. *Id.* at 639-40 (citing *Tennard*, 802 S.W.2d at 684 (finding references to witness' polygraph harmless where other witnesses corroborated his version of events)).

Overall, with respect to the polygraph examination evidence, the trial court found that Cortez failed to meet his burden of proving both the deficiency and prejudice prongs of *Strickland*. *Id.* at 640. The trial court specifically found that trial counsel did not render ineffective assistance of counsel by failing to object to the testimony that the police administered polygraph examinations. *Id.* The trial court found that counsel did not render ineffective assistance of counsel by failing to object to testimony stating or implying the results of the polygraph examinations. *Id.* The finding was made that relief should be denied on the claim. *Id.* The Texas Court of Criminal Appeals subsequently denied relief based on the trial court's findings and conclusions and its own review. *Ex parte Cortez*, 2013 WL 458197, at *1.

The analysis of the present ineffective assistance of counsel claim may begin and end with the Fifth Circuit's recent decision in *Dodson v. Stephens*, 611 F. App'x 168 (5th Cir. 2015). Like both Cortez and the state trial court in this case, the Fifth Circuit cited *Tennard* for the proposition that "[t]he existence and results of a polygraph examination are inadmissible for all purposes." *Id.* at 176 (citing *Tennard*, 802 S.W.2d at 683). The Fifth Circuit went on to observe, however, that the issue before the court was whether counsel's representation was deficient for failing to object to such evidence, and the finding was made that it was entirely reasonable for an attorney to conclude that an objection to such evidence would do more harm than good. *Id.* The Fifth Circuit observed that a "conscious and informed decision on trial tactics and strategy cannot be the basis of constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Id.* The finding was made that the decision not to object in that case was trial strategy and not ineffective assistance of counsel. *Id.* Moreover, "since the state habeas court's application of *Strickland*'s deficiency prong was reasonable, and its decision was not based on an unreasonable determination of the facts in light of the record before it, the district court was precluded from granting habeas relief." *Id.* 176-77 (citing *Richter*, 562 U.S. at 101). The Fifth Circuit added that there was no need to discuss *Strickland*'s prejudice prong under the circumstances. *Id.* at 177.

In the present case, Cortez's attorneys decided not to object to the testimony about the police administering polygraph examinations. Just like in *Dodson*, counsel thought that an objections would do more harm than good. But more importantly, the evidence actually furthered the defense's goal of showing that the police were inept and to give the impression to the jury that the defense was being as forthcoming as possible. Defense counsel's conscious and informed decision in this case was trial strategy that cannot form the basis of a meritorious ineffective assistance of counsel claim.

In addition to the foregoing, the ineffective assistance of counsel claim should be rejected because Cortez has not shown, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Indeed, the state habeas court carefully and thoroughly discussed the facts and reasonably applied *Strickland* to the facts before it. The state habeas court found that counsel's representation on this issue was not deficient and that Cortez had not shown prejudice. Cortez has not shown that the findings were unreasonable. Finally, Cortez failed to overcome the doubly deferential standard that must be accorded to counsel in the context of § 2254(d); thus, he is not entitled to federal habeas corpus relief on his fourth ineffective assistance of counsel claim. Overall, Cortez has not shown that he is entitled to federal habeas corpus relief based on the claim that counsel was ineffective at trial.

### Claim Number 2: Ineffective assistance regarding punishment

Cortez next claims that his attorneys were ineffective during the punishment phase of the trial. He noted that the Tenth Circuit observed that the "sentencing stage is the most critical phase of a death penalty case. . . . [Mitigation evidence] affords an opportunity to humanize and explain - to individualize a defendant outside the constraints of the normal rules of evidence." *Romano v. Gibson*, 239 F.3d 1156, 1180 (10th Cir. 2002) (citation and internal quotation marks omitted). He alleges that trial counsel failed to adequately investigate, discover and present evidence for mitigation purposes, as required by the Supreme Court in *Wiggins v. Smith*, 539 U.S. 510 (2003).

Cortez acknowledges that trial counsel hired Kelly Goodness, a psychiatrist, as a mitigation expert and that she was paid approximately $23,000.00 for her work, but he faults counsel for not

calling her as a witness. Cortez complains that counsel called only five witnesses during the punishment phase of the trial. He complains that counsel failed to present witnesses about his background and work history, such as high school guidance counselors, psychologists and co-workers. He also complains that counsel failed to present evidence about his childhood. He complains that counsel failed to investigate potential avenues showing that he was not a future danger, including witnesses who knew about his work history. Lastly, he complains that counsel failed to put forward his jail records, which would have revealed no instances of violence or real disciplinary infractions.

As noted by Cortez, the record reveals that counsel called five witnesses during the punishment phase of the trial. The first witness was Dr. Mark Vigen, who testified about prison security measures and prison classification. He testified that the "Texas Department of Criminal Justice is a well run prison system." 48 RR 128. He expressed the opinion that the prison system has the ability to control "Cortez, such that he will be a low risk for violent behavior in the prison system." *Id.* at 132. Despite Cortez's assertions to the contrary, such testimony shows that counsel did investigate and present evidence to support a conclusion that he would not be a future danger.

Counsel then called four of Cortez's relatives. The first relative to testify was Cortez's sister Delia. She testified that Cortez was a good brother and hard worker. 49 RR 6. She testified that her brother worked at McDonald's and was moved up to supervisor. *Id.* at 7. She testified that he also worked at Tejas Stone and received promotions. *Id.* She said that his being promoted without a high school education was a source of pride for the family. *Id.* She asked the jury to show mercy for the sake of her family. *Id.* at 8. On cross-examination, after discussing gang life in Chicago, she testified that the family moved from Chicago to McKinney for his benefit. *Id.* at 12.

Cortez's niece, Naomi, described him as a good uncle and like a father to her. *Id.* at 14-15. She likewise asked the jury to show mercy for the sake of the family. *Id.* at 15. Javier Cortez, the

petitioner's father, testified that he had a religious conversion, and he believed that his son could also have such a conversion. *Id.* at 17-18. He likewise asked the jury to show mercy. *Id.* at 20. On cross-examination, Javier Cortez testified that the family moved from Chicago to help his son after he had been shot in 2002. *Id.* at 23. Elsa Cortez, the petitioner's mother, likewise asked the jury to show mercy. *Id.* at 25.

During the state habeas corpus proceedings, Cortez's habeas counsel argued that trial counsel was ineffective during the sentencing phase of the trial. More specifically, trial counsel was allegedly ineffective for failing to introduce evidence of Cortez's good behavior while incarcerated in the Collin County Jail.

The precise issue raised in the state application for a writ of habeas corpus was fully developed during the state habeas proceedings. The State offered evidence from both the Collin County Jail and the jail in Orange County, Florida, where Cortez was arrested. 2 SHCR 311, 314-45. In Orange County, due to being wanted for multiple murders and his membership in the Latin Kings, Cruz's custody level was Maximum 1, which meant that he was housed alone and under Administrative Confinement. *Id.* at 311. While confined in the Collin County Jail, Cortez was listed as a priority inmate and "made a Double Guard/Full restraint out of cell/Keep a way from all other inmates/DRT out of facility." *Id.* at 469.

The issue of whether counsel was ineffective during the punishment phase of the trial was one of many issues addressed during the state writ hearing. Lead counsel John Tatum testified that they never submitted the jail records because they were handling the issue through Dr. Vigen, an expert, who testified that Cruz "could be controlled in prison and there was no reason to execute him." 2 SHRR 28-29. Tatum observed that "the way he was being handled as a special prisoner didn't give

much leeway to what you're talking about, even though we believe that if he had been a discipline problem, obviously the State would have introduced it." *Id.* at 29.

Co-counsel Richard Franklin testified that with respect to good jail conduct, "the mitigation specialist would have been in that realm together with Dr. Vigen." 2 SHRR 97. With respect to Cortez's pre-arrest behavior in the free world, Franklin observed that the evidence that Cortez held a responsible job and had no reports of criminal activity had "greater weight." *Id.* at 99. He described introducing evidence of a lack of infractions to prove lack of future dangerousness was "like trying to prove a negative." *Id.* at 101.

Co-counsel Doug Park testified that in light of the evidence that Cortez was kept in a very restrictive environment in the jail awaiting trial, the fact that he behaved in jail had "very marginal relevance." 3 SHRR 19. He noted that the defense team chose to go with very relevant evidence, as opposed to "some that was practically irrelevant." *Id.* at 20. He added, that "you concentrate on what is good for you and you don't go down rabbit trails and stuff that's not particularly relevant." *Id.* at 21. Park subsequently testified that the lack of infractions "doesn't impress people most of the time, especially people who are sophisticated like the people in Collin County." *Id.* at 66. Instead, "[w]hat impresses people, [he] thought, is in a situation like his where he did not do anything bad when he was out there in real society, and that was a big deal really, and it's quite unusual as a matter of fact." *Id.*

After collecting all of the evidence and listening to the testimony of the witnesses, the state trial court found that counsel was in possession and investigated Cortez's jail records. 3 SHCR 688. The finding was made that there was no evidence that Cortez committed more than *de minimis* infractions while confined in county jail pending his trial. *Id.* at 690. The state trial court found that defense counsel chose to call some of Cortez's "family members, who asked the jury to be merciful." *Id.* The state trial court found that this was reasonable trial strategy. *Id.* The state trial court found that defense

counsel called Dr. Mark Vigen, a psychologist, who testified that the Texas prison system was run well and that the prison system had the ability to control inmate behavior to control violence. *Id.* at 690-91. The state trial court found that it was reasonable trial strategy to call Dr. "Vigen to testify that the prison system had the ability to control [Cortez] so that he would be a low risk for violent behavior in the prison." *Id.* at 691. The state trial court also made findings noting Cortez's history of murdering people, his gang activity and his "dark side." *Id.* The state trial court found that the jury heard credible evidence that the Latin Kings gang, of which Cortez was a member, "is known for its violence even from within prison walls." *Id.* at 692. The state trial court thus concluded that trial counsel was not deficient for failing to introduce evidence about Cortez's behavior while confined in county jails, which "had very marginal relevance to whether [Cortez] would have been a danger if sentenced to life in prison." *Id.* The finding was made that "[c]ounsel's strategic decision was accurate and reasonable." *Id.* at 693. The state trial court weighed the value of the evidence presented during the punishment phase of the trial with the omitted evidence and concluded that Cortez's "ability to behave in the county jails was of no value to the future danger special issue." *Id.* The state trial court finally concluded that Cortez failed to meet his burden of proving both the deficiency and the prejudice prongs of *Strickland*; thus, the recommendation was made to deny relief. *Id.* at 698. The Texas Court of Criminal Appeals subsequently denied relief based on the trial court's findings and conclusions and its own review. *Ex parte Cortez*, 2013 WL 458197, at *1.

Cortez has not shown, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. He likewise failed to overcome the doubly deferential standard that must be accorded

48

to counsel in the context of § 2254(d). He has not shown that he is entitled to relief to the extent that his claim of ineffective assistance of counsel during the punishment phase of the trial concerns issues raised in the state habeas corpus proceedings.

Instead of focusing on the issues actually raised in the state habeas corpus proceedings, Cortez argues that state habeas counsel should have raised a whole host of other issues. The Director appropriately argued that these claims are unexhausted and procedurally barred. Cortez argues, however, that the claims are not procedurally barred in light of *Martinez* and *Trevino*. As was previously noted on pages 20-21 of this memorandum opinion, the Fifth Circuit summarized the application of the rule announced in *Martinez* and *Trevino* as follows:

> To succeed in establishing cause to excuse the procedural default of his ineffective assistance of trial counsel claims, [petitioner] must show that (1) his underlying claims of ineffective assistance of trial counsel are "substantial," meaning that he "must demonstrate that the claim[s] ha[ve] some merit," *Martinez*, 132 S. Ct. at 1318; and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. *See id.*; *Trevino*, 133 S. Ct. at 1921.

*Preyor*, 537 F. App'x at 421. The Fifth Circuit subsequently reaffirmed this basic approach in *Reed*, 739 F.3d at 774.

The thrust of Cortez's claim focuses on *Wiggins*. Thus the issue before the Court is whether his underlying claim of ineffective assistance of trial counsel based on *Wiggins* is "substantial," meaning he must demonstrate that the claim has some merit. In a capital sentencing proceeding, "defense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances." *Neal v. Puckett*, 286 F.3d 230, 236-37 (5th Cir. 2002) (quoting *Baldwin v. Maggio*, 704 F.2d 1325, 1332-33 (5th Cir. 1983)), *cert. denied*, 537 U.S. 1104 (2003). In assessing whether counsel's performance was deficient, courts look to such factors as what counsel did to prepare for sentencing, what mitigation evidence he had accumulated, what additional

"leads" he had, and what results he might reasonably have expected from those leads. *Neal*, 286 F.3d at 237. The reasonableness of counsel's investigation involves "not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. *See also Blanton v. Quarterman*, 543 F.3d 230, 236 (5th Cir. 2008), *cert. denied*, 556 U.S. 1240 (2009). "[C]ounsel should consider presenting . . . [the defendant's] medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." *Id.* at 524 (citing ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases § 11.8.6, at 133 (1989). The Supreme Court stated in *Wiggins* that the "investigation into mitigating evidence should comprise efforts to discover *all reasonably available* mitigating evidence." *Id.*

The Court added, however, that the investigation into mitigating evidence has limits:

> [We] emphasize that *Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does *Strickland* require defense counsel to present mitigating evidence at sentencing in every case. Both conclusions would interfere with the "constitutionally protected independence of counsel" at the heart of *Strickland*, 466 U.S., at 689, 104 S.Ct. 2052. We base our conclusion on the much more limited principle that "strategic choices made after less than complete investigation are reasonable" only to the extent that "reasonable professional judgments support the limitations on investigation." *Id.* at 690-91, 104 S.Ct. 2052. A decision not to investigate thus "must be directly assessed for reasonableness in all the circumstances." *Id.*, at 691, 104 S.Ct. 2052.

*Wiggins*, 539 U.S. at 533. The Court held in *Wiggins* that counsel's representation "fell short of . . . professional standards" for not expanding their investigation beyond the investigation report and one set of records they obtained, particularly "in light of what counsel actually discovered" in the records. *Id.* at 524-25. On the other hand, the Court has found that trial counsel's performance was not deficient where he gathered a substantial amount of information and then made a reasonable decision not to pursue additional sources. *Bobby v. Van Hook*, 558 U.S. 4, 11-12 (2009). Similarly, in

*Strickland*, the Court found that counsel's decision not to seek more character or psychological evidence than was already in hand was reasonable. *Strickland*, 466 U.S. at 699.

In order to establish that counsel was ineffective due to a failure to investigate the case, Cortez must do more than merely allege a failure to investigate; instead, he must state with specificity what the investigation would have revealed, what specific evidence would have been disclosed, and how the evidence would have altered the outcome of the trial. *Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994); *Hernandez v. Thaler*, 398 F. App'x 81, 88 (5th Cir. 2010). Without such a showing, "a habeas court cannot even begin to apply [*Washington's*] standards." *Id.* Cortez failed to satisfy his burden. Instead, he merely presented global complaints that counsel failed to call the mitigation expert; that counsel failed to present witnesses about his background and work history, such as high school guidance counselors, psychologists and co-workers; that he failed to present evidence about his childhood; and that counsel failed to investigate potential avenues showing that he was not a future danger, including witnesses who knew about his work history.

To succeed on a claim about uncalled witnesses, a petitioner must show that had counsel investigated the claim he would have found witnesses to support the defense, that such witnesses were available, and had counsel located and called these witnesses, their testimony would have been favorable and they would have been willing to testify on his behalf. *Alexander*, 775 F.2d at 602; *Gomez v. McKaskle*, 734 F.2d 1107, 1109-10 (5th Cir.), *cert. den.,* 469 U.S. 1041 (1984). Failure to produce an affidavit (or similar evidentiary support) from the uncalled witness severely undermines a claim of ineffective assistance. *Sayre v. Anderson*, 238 F.3d 631, 636 (5th Cir. 2001). Conclusory claims are insufficient to entitle a habeas corpus petitioner to relief. *United States v. Woods*, 870 F.2d 285, 288 (5th Cir. 1989); *Schlang v. Heard*, 691 F.2d 796, 799 (5th Cir. 1982), *cert. denied*, 461 U.S. 951 (1983). *See also King v. Cockrell*, 33 F. App'x. 703 (5th Cir. 2002).

The Fifth Circuit recently issued a decision that illustrates how a death row inmate can satisfy the requirements of *Martinez* and *Trevino* in *Canales v. Stephens*, 765 F.3d 551 (5th Cir. 2014). The petitioner in that case attached a declaration from his trial attorney to the petition that was filed in the federal district court. The declaration was attached as exhibit 1. In the declaration, counsel discussed his efforts to satisfy *Wiggins* in paragraphs nine through eleven. From the record developed in the federal district court, the Fifth Circuit observed that counsel dedicated only $2,500 to investigation, most of which went to issues related to innocence, because he erroneously thought his funding was limited to $2,500. *Id.* at 569. The Fifth Circuit found that counsel's decision not to pursue the *Wiggins* claim in any depth because he thought he could not receive additional funding fell below an objective standard of reasonableness. *Id.* The Fifth Circuit further found that the ineffective assistance of counsel claim involving the punishment phase of the trial had some merit. *Id.* at 570. The finding was also made that the petitioner had established cause to excuse the procedural default. *Id.* at 571. The case was remanded in order to give the petitioner the opportunity to prove prejudice. *Id.*

In the present case, Cortez complains that counsel failed to call the mitigation expert; that counsel failed to present witnesses about his background and work history, such as high school guidance counselors, psychologists and co-workers; that counsel failed to present evidence about his childhood; and that counsel failed to investigate potential avenues showing that he was not a future danger, including witnesses who knew about his work history. Cortez did not, however, submit any affidavits or similar evidentiary support from trial counsel, Dr. Goodness and other uncalled witnesses showing that they would have offered favorable testimony and that they would have been willing to testify on his behalf. He has offered nothing other than conclusory allegations and bald assertions, which are insufficient to support a petition for a writ of habeas corpus. *See Miller*, 200 F.3d at 282; *Koch*, 907 F.2d at 530; *Ross*, 694 F.2d at 1011.

In conclusion, Cortez's new claims of ineffective assistance of counsel during the punishment phase of the trial are unexhausted. He has not satisfied the cause and prejudice standard established in *Martinez* and *Trevino* by showing that (1) underlying claims of ineffective assistance of trial counsel are "substantial," and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. Thus his new and unexhausted claims of ineffective assistance of counsel during the punishment phase of the trial are procedurally defaulted.

**Claim Number 3:     Withholdings in violation of *Brady v. Maryland***

In claim number three, Cortez alleges that the State withheld evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1962). More specifically, the State failed to disclose a deal with its key witness, Eddie Williams. He argues that this point is accentuated by the fact that the State contended in its opening argument that it did not have a deal with any witness. Indeed, at the very beginning of its direct examination of Williams, the State asked:

> Q.     Has anyone from the Collin County District Attorney's Office made you any deals or agreement or arrangement to testify in this case?

> A.     No, sir.

41 RR 43. Cortez notes, however, that Williams pled guilty to a remarkably lenient plea deal after his trial was over. Williams pled guilty to three of the murders. He asserts that Williams was sentenced, pursuant to an agreement with the State, to 20 years in prison for murdering at least two people at Truett Street. Williams will be eligible for parole in July 2017.

The Director argues that there is no evidence that Williams and the State had a deal. He argues that Cortez has not shown a *Brady* violation.

The Supreme Court has held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or

punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The duty to provide favorable evidence includes impeachment evidence as well as exculpatory evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985). In order to prevail on a *Brady* claim, the Fifth Circuit requires a petitioner to show that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material to his guilt or innocence. *Mahler v. Kaylo*, 537 F.3d 494, 500 (5th Cir. 2008) (citations omitted). "Evidence is 'material' only when there exists 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* (citing *Bagley*, 473 U.S. at 682). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109-10 (1976). "Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *West v. Johnson*, 92 F.3d 1385, 1399 (1996) (citation omitted), *cert. denied*, 520 U.S. 1242 (1997).

The *Brady* claim was fully developed during the state habeas proceedings. The State introduced its written plea agreement with Williams, executed on February 17, 2010, about a year after Cortez's trial. 1 SHCR 169-72 The State also introduced a copy of the judgment, which shows that Williams pled guilty to the lesser included offense of murder and was sentenced to twenty years of imprisonment. *Id.* at 173-75.

The State also introduced an affidavit from Gregory S. Davis, the lead prosecutor. He provided the following response to the *Brady* claim:

> As part of my trial strategy, I never met or communicated with Eddie Williams prior to his appearance as a witness at the trial of Raul Cortez. Further, I never instructed or

authorized any employee of the Collin County District Attorney's Office to meet or communicate with Mr. Williams prior to his appearance as a witness at the trial of Raul Cortez.

I never offered or promised any benefit to Eddie Williams in exchange for his testimony at the trial of Raul Cortez. Further, I never instructed or authorized any employee of the Collin County District Attorney's Office to offer or promise any benefit to Mr. Williams prior to his appearance as a witness at the trial of Raul Cortez.

In discussions held prior to the trial of Raul Cortez, I informed Mr. Williams' attorney, Paul Brauchle, that I would make no promise of leniency or plea recommendation to Mr. Williams in exchange for his testimony. I also told Mr. Brauchle that any plea negotiations with his client would occur only after the conclusion of the trial of Raul Cortez. Mr. Brauchle later informed me that Mr. Williams was willing to testify at the trial of Raul Cortez without a promise of leniency or plea recommendation.

I did not initiate plea negotiations with Paul Brauchle until after the conclusion of the trial of Raul Cortez. These negotiations took several weeks to conclude. I did not convey a final plea recommendation to Mr. Brauchle until after I had met with and received imput from the families of Austin York, Matt Self, and Rosa and Mark Barbosa.

*Id.* at 178.

Brauchle also executed an affidavit. 2 SHCR 490-91. Brauchle stated that "[t]houghout my visits with [Williams] he continually asked that I secure him assurances from the district attorney and I continually advised him that none would be given." *Id.* at 490. He added that he approached the State after the trial in regard to a plea bargain and reached an agreement. *Id.* at 491.

After collecting all of the evidence compiled on this issue, the state trial court issued extensive findings rejecting the claim. 3 SHCR 678-81. The state trial court observed that Cortez "contends that there 'must have been' a 'deal' with Eddie Williams and that the State violated his due process rights by failing to disclose the deal." *Id.* at 678. The state trial court found that there was no plea agreement between the State and Williams or his attorney in exchange for Williams' testimony. *Id.* Moreover, the "only evidence on the subject of a plea agreement expressly refutes the existence of any agreement in exchange for Williams' testimony." *Id.* The trial court specifically noted that Williams, during the trial, denied there was any plea agreement. *Id.* The trial court found that Williams was a credible

witness.  *Id.* at 679.  The trial court discussed the affidavits submitted by Davis and Brauchle and found that their affidavits were credible and their statements were true.  *Id.* at 679-80.  The state trial court ultimately found that "[s]ince there was no plea agreement between the State and Williams in exchange for Williams' testimony, there was nothing for the State to have disclosed."  *Id.* at 681.  Moreover, the finding was made that Cortez's due process rights were not violated and that the claim should be denied.  *Id.* The Texas Court of Criminal Appeals subsequently denied relief based on the trial court's findings and conclusions and its own review.  *Ex parte Cortez*, 2013 WL 458197, at *1.

Cortez uses the term "charade" in disputing the state court findings, but he has not rebutted the presumption of correctness that must be accorded to the findings with clear and convincing evidence, as required by § 2254(e)(1).  Instead, he has offered nothing other than supposition, conclusory allegations and bald assertions, which are insufficient to support a petition for a writ of habeas corpus. *See Miller*, 200 F.3d at 282;  *Koch*, 907 F.2d at 530;  *Ross*, 694 F.2d at 1011.  Based on the evidence before the state trial court, the state court reasonably found that there was no *Brady* violation.  Cortez simply has not shown, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Relief on ground number three should be denied.

### Claim Number 4:  Sufficiency of the evidence

In claim number four, Cortez argues that the evidence at trial was insufficient to convict him of capital murder.  He asserts that Eddie Williams' testimony "makes absolutely no sense."  He notes that apart from Williams' testimony, only three items of evidence actually tied him to the murders: weak DNA evidence, the bullet in the ceiling of his home, and the location of Matt Self's truck.  He

asserted that the DNA samples were a mixture, partial or both, and all that it could show was that he could not be excluded. With respect to the bullet in the ceiling, he testified at trial that Williams brought the gun to his house and accidentally discharged it. 47 RR 70. He characterized the location of Matt Self's truck at his old apartment complex as purely circumstantial. He stressed that the only real evidence was Eddie Williams' testimony and that Texas law prevents defendants from being convicted based solely on the testimony of an accomplice witness. Tex. Code Crim. Proc. art. 38.14.

Sufficiency of the evidence claims are governed by the standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). The Supreme Court held that in a federal habeas corpus proceeding challenging the sufficiency of the evidence supporting a state conviction, a petitioner is entitled to relief where "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* at 319. In applying the standard, "all of the evidence is to be considered in the light most favorable to the prosecution." *Id.* at 320. The Court added that this "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n. 16. *See Brown v. Collins*, 937 F.2d 175, 180 (5th Cir. 1991) (applying the *Jackson* standard). "Under *Jackson*, [a federal court] may find the evidence sufficient to support a conviction even though the facts also support one or more reasonable hypotheses consistent with the defendant's claim of innocence." *Gibson v. Collins*, 947 F.2d 780, 783 (5th Cir. 1991), *cert. denied*, 506 U.S. 833 (1992).

In the present case, the State charged Cortez with the offense of capital murder by intentionally causing the death of Austin York by shooting him with a firearm in the course of committing or attempting to commit, robbery or burglary, in violation of Section 19.03(a)(2) of the Texas Penal Code. The Texas Court of Criminal Appeals appropriately cited and applied *Jackson v. Virginia* as the standard to use in determining whether the evidence was sufficient to support the

conviction. *Cortez*, 2011 WL 4088105, at *1. After analyzing the evidence, as presented on pages

two through five of this memorandum opinion, the Texas Court of Criminal Appeals found that a

"rational jury could have determined that Cortez intentionally caused the death of Austin York, as

a principal or party, by shooting York while in the course of committing or attempting to commit

robbery or burglary." *Id.* at 5. The Texas Court of Criminal Appeals applied the correct standard

as established by the Supreme Court, and they applied the standard with explicit reference to the

substantive elements of the criminal offense as defined by Section 19.03(a)(2) of the Texas Penal

Code.

Cortez complains that he was found guilty primarily on the testimony of Eddie Williams,

which he asserts "makes absolutely no sense." Williams' testimony alone, however, was sufficient

to support the conviction. *Brown*, 937 F.2d at 182 n.12 (5th Cir. 1991) ("[T]he Constitution imposes

no requirement that the testimony of an accomplice-witness be corroborated by independent

evidence."). The credibility of Williams "was within the sole province of the jury as the fact finder,"

and this Court "will not second guess . . . its choice of which witnesses to believe." *United States*

*v. Zuniga*, 18 F.3d 1254, 1260 (5th Cir. 1994). Moreover, "it is the responsibility of the jury - not

the court - to decide what conclusions should be drawn from the evidence admitted at trial."

*Cavazos v. Smith*, 132 S. Ct. 2, 3-4 (2011). Based on Williams' testimony, a rational jury could have

found Cortez guilty beyond a reasonable doubt.

The physical evidence presented at trial added support to Williams' testimony. Williams'

testimony laid out the crime and matched the physical evidence. The DNA evidence linked Cortez to

the bit of glove latex stuck to the duct take binding Rosa Barbosa. Cortez offered an alternative

explanation, but the jurors were free to believe Williams' story and disbelieve Cortez's story. As for

the bullet in the ceiling at the Kentucky Street address, the jury was free to believe Williams' story linking Cortez to the slug. The jury was also free to believe Williams' story about how the truck happened to be abandoned in the parking lot of Cortez's former apartment complex. The physical evidence supported and lent credibility to Williams' testimony. Based on Williams' testimony, coupled with the physical evidence, a rational jury could have found Cortez guilty beyond a reasonable doubt. The insufficient evidence claim lacks merit. Moreover, Cortez has not satisfied his burden under § 2254(d) on this issue. Cortez has not shown that he is entitled to relief on claim number four.

**Claim Number 5:** **TDCJ Classification Testimony**

In claim number five, Cortez alleges that A. P. Merillat, an expert who testified about the state classification system, gave false information about the prison classification system as it would likely apply to him if he was given a life sentence. He asserts that Merillat has a history of giving false testimony, as seen in *Estrada v. State*, 313 S.W.3d 274, 287 (Tex. Crim. App. 2012), and *Velez v. State*, No. AP-76,051, 2012 WL 2130890, at *31-33 (Tex. Crim. App. 2012) (unpublished).

The record reveals that Merillat testified as an expert for the State during the punishment phase of the trial. He testified that he was a certified peace officer and a senior criminal investigator for the Special Prosecution Unit. 49 RR 39. He provided the following testimony about how Cortez would be classified if he received a life sentence, as opposed to the death penalty:

> An inmate convicted of capital murder, who does not receive the death penalty, because of his sentence will go into the prison system automatically from day one as what is called G3.
>
> The classification system levels are G1 for so-called good inmate or our term is lightweight inmate, a less severe crime in other words. So G1 is a good inmate, G2 is okay, G3 is middle of the road, G4 is more badly behaved and G5 is very badly behaved inmate.
>
> So a convicted capital murderer will go into the prison system as G3, which is right in the middle. He will go in as the same level as any inmate that goes into the system brand new with a 50 year of more sentence.

The years of sentence is what determines that G3 level. It's not because he is a capital murderer, that just happens to be what his sentence was, so he will go in from day one middle of the road, average classification for an inmate housed in the general population with other inmates with all types of crimes. In other words, they don't put capital murderers in the same building or the same part of the state or same unit.

He can be housed with DWI felons or robbers or rapists or child molesters or burglers or other capital murderers or lesser murderers.

He has to earn a more strict classification by bad acts.

49 RR 42-43. He agreed that an inmate convicted of capital murder, if well behaved, could receive a reduction to G2 after he has served at least ten years. *Id.* at 56.

Cortez cites *Estrada* and *Velez* for the proposition that Merillat's testimony was false. The record reveals that *Estrada* involved a capital murder case where the offense occurred on December 12, 2005. *Estrada*, 313 S.W.3d at 279. Merillat testified during the sentencing phase that, "after 10 years of G-3 status, a capital murderer who had been sentenced to life without parole could earn a lower, less restrictive, G classification status than a G-3 status." *Id.* at 286. During deliberations, the jury sent out two notes about such testimony. *Id.* The Texas Court of Criminal Appeals observed that the testimony was false in light of a new 2005 TDCJ regulation, judicially noticed by the *Estrada* Court, that "unambiguously shows, 'Effective 9/1/05, offenders convicted of Capital Murder and sentenced to 'life without parole' will *not* be classified to a custody less restrictive than G-3 throughout their incarceration' (it appears that before September 1, 2005, a sentenced-to-life-with-the -possibility-of-parole capital murderer could have obtained a lower and less restrictive G-3 status after ten years)." *Id.* at 287. The Texas Court of Criminal Appeals remanded the case for a new punishment phase with the finding that "there is a fair probability that appellant's death sentence was based upon Merillat's incorrect testimony as evidenced by the jury's notes." *Id.* It should be recalled that the offense in the current case occurred on March 12, 2004, which was before the changes effective September 1, 2005.

60

*Velez* involved a capital murder that occurred on October 31, 2005. 2012 WL 2130890, at *1. Merilat gave the same erroneous testimony that he gave in *Estrada*. The Texas Court of Criminal Appeals found that it could not find beyond a reasonable doubt that Merrillat's false testimony "did not contribute to the conviction or punishment." *Id.* at *33.

It is noted that the Texas Court of Criminal Appeals has discussed Merillat testifying as a witness in numerous cases both before and after the decisions issued in *Estrada* and *Velez*. *See, e.g., Escobar v. State*, No. AP-76,571, 2013 WL 6098015, at *27-28 (Tex. Crim. App. 2013); *Ex parte Swain*, No. WR-64,437-02, 2012 WL 5452217, at *1 (Tex. Crim. App. 2012); *Martin v. State*, No. AP-76,317, 2012 WL 5358862, at *8 (Tex. Crim. App. 2012). At the time this opinion was being prepared, the Court found seventeen decisions where Merillat had been mentioned or discussed by the Texas Court of Criminal Appeals. In *Swain*, the Texas Court of Criminal Appeals observed that applicant's offense and trial occurred prior to the effective date of the regulation that was the subject of Merrillat's inaccurate testimony in *Velez* and *Estrada*; thus, the holdings in those cases did not affect applicant's case. *Swain*, 2012 WL 5452217, at *1. In another case, the Texas Court of Criminal Appeals observed that it had upheld Merrillat's testimony as reliable and relevant to the future dangerousness issue concerning the opportunities for violence in prison society, however, it had remanded *Estrada* for a new punishment phase due to Merrillat's "unintentionally inaccurate testimony concerning reclassification of capital-murder inmates." *Gobert v. State*, No. AP-76,345, 2011 WL 5881601, at *6 (Tex. Crim. App. 2011).

With this background information established by the time the state habeas court considered Cortez's case, the state habeas court issued the following findings regarding Merrillat's testimony:

> 472.　　As of September 1, 2005, a person convicted of capital murder but not sentenced to death is automatically sentenced to life in prison without the possibility of parole. TEX.

PENAL CODE § 12.31(a); *see* Act of Nov. 8, 2004, 79th Leg., ch. 787 ("S.B. 60"), at § 1.

473. In amending Penal Code Section 12.31, the Legislature specifically provided that an offense committed before September 1, 2005 is covered by the law in effect when the offense was committed. *See* S.B. 60 at § 17(b).

474. For an offense committed prior to September 1, 2005, a capital murderer sentenced to life entered the Texas prison system at a custody level of G3 but could be reclassified at a lower and less restrictive G2 level after ten years. *See* Texas Department of Criminal Justice Correctional Institutions Division, *Classification Plan* (revised by Classification and Records Oct. 2003) ("Classification Plan"), at C-1(A)(2) & (3), pp. 76, 78; *Estrada v. State*, 313 S.W.3d 274, 287 (Tex. Crim. App. 2010).

475. According to a TDCJ regulation effective September 1, 2005, a convicted capital murderer sentenced to life without the possibility of parole may not ever be classified at a custody level less restrictive tha G3. *See* Texas Department of Criminal Justice, *Unit Classification Procedure* (July 2005) ("2005 Regulation"), at 2; *Estrada*, 313 S.W.3d at 287.

476. At the punishment stage of [Cortez's] trial, the State's witness A. P. Merillat, a Senior Criminal Investigator with the State's Special Prosecution Unit, testified about the classification system used by the Texas prison system. 49 RR 39, 42-45.

477. Merillat testified that a person convicted of capital murder but not given the death penalty would automatically enter prison at custody level G3, where the levels range from G1 (the least restrictive) to G5 (the most restrictive). 49 RR 42-45, 54-60.

481. Merillat's testimony was not false.

482. The offense in this case occurred in 2004, and [Cortez's] punishment was governed by the law in effect at that time. 1 CR 9; *see* S.B. 60 at § 17(b).

485. The 2005 Regulation does not alter that provision because it addresses a sentence of life without parole, not life with the possibility of parole. 2005 Regulation at 2.

486. Merillat's testimony - suggesting that, if [Cortez] had been sentenced to life in prison, he could have been reclassified at custody level G2 after ten years (49 RR 56) - was a correct statement about the classification system that would have applied to [Cortez] if he had received a life sentence for the 2004 murder.

487. Since [Cortez's] death sentence was not based on false information, his constitutional rights were not violated.

488. [Cortez's] contrary argument in his writ is based on a misstatement of the facts and a misstatement of the law.

492. [Cortez] suggests that, because his trial took place in 2009, his case was governed by the law in effect in 2009.

493. But that is a misunderstanding of the law. [Cortez's] case was governed by the law in effect at the time of the murder, and the case was correctly tried under the 2004 law.

494. The instant case is not like *Estrada* or *Velez v. State*, No. AP-76051, 2012 WL 2130890 (Tex. Crim. App. June 13, 2012) (not designated for publication). In those cases, the murders took place after September 1, 2005, so the defendants' non-death sentences would have been life without the possibility of parole. When Merillat told the jury that those defendants could have achieved less than a G3 prison classification, he told the jury false information since a defendant serving life without parole can not be classified less than G3. However, because the murders in the instant case occurred in 2004 and [Cortez's] non-death sentence would have been life *with* the possibility of parole, he *would* have been able to achieve less than a G3 prison classification. Therefore, the testimony that was false in *Estrada* and *Velez* was true in the instant case.

495. Because Merillat's testimony was not false, this ground for relief should be denied.

3 SHCR 682-85. The Texas Court of Criminal Appeals subsequently denied relief based on the trial court's findings and conclusions and its own review. *Ex parte Cortez*, 2013 WL 458197, at *1.

In the present case, Cortez merely renews his claim that Merillat's testimony was false. He again argues that Merillat's testimony was false in light of *Estrada* and *Velez*. The state court, however, fully explained why the testimony that was false in *Estrada* and *Velez* was actually true in the instant case. Cortez has not rebutted the presumption of correctness that must be accorded to the state court findings of fact with clear and convincing evidence. Instead, he does nothing more in the present petition than to reurge the same erroneous claim that he presented to the state courts. He made no effort to correct his claims in light of the state court findings. Overall, Cortez has not shown, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the

Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Cortez also argues that in light of *Estrada* and *Velez* he is entitled to relief based on *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (holding that "a conviction obtained through the use of false evidence, known to be such by representative of the State, must fall under the Fourteenth Amendment."). He has not, however, shown that the State secured the conviction or death sentence through the use of false or highly misleading evidence. As the state court carefully explained, the information that was false in *Estrada* and *Velez* was actually true in the present case.

Cortez also argues that the State violated *Brady v. Maryland*. The Court previously discussed the case law surrounding *Brady* in conjunction with claim number three. The facts of this claim do not, however, involve Cortez's rights under *Brady*. There was nothing to disclose in this case. The *Brady* argument lacks merit.

Cortez goes on to present his argument in terms of an ineffective assistance of counsel claim. He asserts that his attorney was ineffective for failing to correct the record by introducing evidence rebutting Merillat's testimony in order to correct the record. However, Merillat's testimony was correct. Counsel had nothing to correct. Counsel was not required to make frivolous or futile motions or objections. *Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002), *cert. denied*, 538 U.S. 926 (2003); *Koch*, 907 F.2d at 527. Cortez has not shown that counsel's representation was deficient on this issue or that he was prejudiced by such deficient representation. The ineffective assistance of counsel claim lacks merit.

This ineffective assistance of counsel claim should also be denied because the state trial court found that counsel was not ineffective with respect to Merillat. 3 SHCR 686. The Texas Court of Criminal Appeals subsequently denied relief based on the trial court's findings and conclusions and

its own review.  *Ex parte Cortez*, 2013 WL 458197, at *1.  Besides lacking merit, Cortez is not entitled to relief on this ineffective assistance of counsel claim for the additional reason that he has not shown, as required by 28 U.S.C. § 2254(d), that the State court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.  All relief on claim number five should be denied.

**Claim Number 6:        Voir Dire issues**

Claim number six concerns issues involving the selection of the jury on voir dire.  Cortez alleges that the trial court erred in denying his challenges for cause in connection with the following venire panel members:  Wendy Davis, Maria Ann Turnage, Donald lee Wahl, Frances Rachea Adams, Tricia Renee Forsyth, Melinda Kay Milner, Carrie Yvonne Monclava, Lisa Ann Steinkamp, Michele Roberts Herbert, Gayla Lunday, Mark Allen Bulloch, Sterling J. Johnson, Jr., and Richard James Black.  In the present petition, he did not discuss why he was entitled to have his challenges for cause granted; instead, he merely states that his challenges for cause should have been granted "for the specific reason stated in each issue."  *See* Petition, page 113.  The Texas Court of Criminal Appeals, on the other hand, fully discussed the challenges for cause as to each of these individuals and overruled every point of error.  *Cortez v. State*, 2011 WL 4088105, at *5-15.  Cortez has not specifically addressed nor shown that the decision issued by the Texas Court of Criminal Appeals was erroneous or unreasonable in any respect.  He has offered nothing other than a conclusory allegation, which is insufficient to support a petition for a writ of habeas corpus.  *See Miller*, 200 F.3d at 282;  *Koch*, 907 F.2d at 530;  *Ross*, 694 F.2d at 1011.

In addition to the foregoing, the claim should be rejected because it lacks merit. The Sixth Amendment right to a fair trial includes the right to an impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 727 (1992). Under the Sixth Amendment, "the quest is for jurors who will conscientiously apply the law and find the facts." *Wainwright v. Witt*, 469 U.S. 412, 423 (1985); *see also Smith v. Phillips*, 455 U.S. 209, 217 (1982) ("Due Process means a jury capable and willing to decide the case solely on the evidence before it"); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) ("In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."). "*Voir dire* examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges." *Mu'Min v. Virgina*, 500 U.S. 415, 431 (1991). The Constitution "does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury. Even so, part of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." *Morgan*, 504 U.S. at 729. "Voir dire 'is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.'" *Ristaino v. Ross*, 424 U.S. 589, 594 (1976) (citing *Connors v. United States*, 158 U.S. 408, 413 (1895)). Where a challenged juror is removed by use of a peremptory challenge following the trial court's denial of a challenge for cause, a petitioner is entitled to federal habeas corpus relief only if he demonstrates that the jury ultimately selected to try the case was not impartial. *Ross v. Oklahoma*, 487 U.S. 81, 85-86 (1988); *Dorsey v. Quarterman*, 494 F.3d 527, 533 (5th Cir. 2007), *cert. denied*, 552 U.S. 1232 (2008); *Soria v. Johnson*, 207 F.3d 232, 241-42 (5th Cir.), *cert. denied*, 530 U.S. 1286 (2000).

In the present case, none of the venire members of which Cortez complains sat on his jury. He does not complain about any sitting juror and does not allege that any sitting juror was biased. On the other hand, he complains that he had to use peremptory challenges to remove some of these members

of the venire panel, but the Supreme Court rejected "the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury." *Ross*, 487 U.S. at 88. Cortez erroneously argues that the "next step is to review each challenge for cause to determine if the trial court abused its discretion." *See* Petition, at 116. In *Ross*, the Supreme Court stressed that the focus must be on the people who ultimately sat on the jury and found that there is no basis for relief if there has been no showing that the jury was not impartial. 487 U.S. at 86-88. Cortez has not shown that his jury was impartial. He has not shown that he is entitled to relief on his claim.

Claim number six must be rejected for the additional reason that Cortez has not shown, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Cortez simply has not shown that the Texas Court of Criminal Appeals unreasonably applied Supreme Court precedent, as set out in *Morgan*, *Witt*, *Irvin* and *Ross*. Relief should be denied on claim number six.

### Claim Number 7: The trial court erred in denying Cortez's motion for a change of venue

Cortez next argues that he is entitled to relief because the trial court erred in denying his motion for a change of venue. In support of his motion for a change of venue in the trial court, he attached 288 pages of aired broadcasts on WFAA/Channel 8-TV, 161 pages of published articles from *The Dallas Morning News,* a videotape containing 44 broadcasts from KTVT-TV/Channel 11 and KTXA-TV/Channel 21, and news stories from the *McKinney Courier-Gazette*. Finally, he attached two affidavits, one from Mr. Steven Miller and the other from Mr. David Hayes. In the present petition,

he did not discuss the contents of the attachments. Nonetheless, he argues that the inflammatory, prejudicial pretrial publicity that pervaded and saturated the community made it virtually impossible for him to obtain a fair trial by an impartial jury. In support of the argument, he focused on the dissenting opinion in *Gonzales v. State*, 222 S.W.3d 446 (Tex. Crim. App. 2007).

The record reveals that the attachments were considered by the state trial court, which denied his motion for a change of venue. The Texas Court of Criminal Appeals subsequently provided the following analysis in rejecting the claim on direct appeal:

> A defendant is entitled to a change of venue if the defendant cannot obtain a fair and impartial trial where venue is proper. When pretrial publicity is at issue, the defendant must show that the publicity was pervasive, prejudicial, and inflammatory. To determine the pervasiveness of the publicity, we look to the hearing on the motion and the voir dire process. And to determine whether the publicity was inflammatory and prejudicial, we examine: "1) the nature of the publicity, 2) any evidence presented at the change of venue hearing, and 3) testimony received from the veniremembers' voir dire." We review a trial judge's ruling on a change of venue motion for an abuse of discretion. . . .

> On this record, we cannot say that the trial judge abused his discretion in denying Cortez's motion. Even assuming that the publicity was pervasive, as Cortez alleges, Cortez has failed to show how the nature of publicity was prejudicial and inflammatory. He does not point to anything specifically inflammatory and prejudicial in any of the media accounts he submitted in support of his motion for change of venue. Nor has Cortez relied on the venire as a whole to show that the publicity was prejudicial and inflammatory. He fails to establish that any of the panel members were unqualified as a result of the pretrial publicity.

> That a case or a defendant has been the subject of media attention, even to the point where it is pervasive, is not inherently prejudicial. Further, as a general rule, we do not regard media accounts that are accurate and objective as prejudicial and inflammatory. In the absence of anything from Cortez that shows that the pretrial publicity was indeed prejudicial and inflammatory, we cannot say that the trial judge abused his discretion by denying Cortez's change of venue motion. We therefore overrule point of error sixteen.

*Cortez v. State*, 2011 WL 4088105, at *15-16 (citations and internal footnotes omitted).

As was explained in conjunction with claim number six, the Sixth Amendment secures to criminal defendants the right to trial by an impartial jury. With respect to pretrial publicity, the Supreme Court has not required that prospective jurors be ignorant of the underlying incident:

It is not required . . . that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin,* 366 U.S. at 722–23 (citations omitted). The Supreme Court has overturned state court convictions due to pretrial publicity only in circumstances where the convictions were "obtained in a trial atmosphere that had been utterly corrupted by press coverage." *Murphy v. Florida*, 421 U.S. 794, 798 (1975). More recently, the Court observed that although it has overturned convictions "obtained in a trial atmosphere that was utterly corrupted by press coverage; our decisions, however, cannot be made to stand for the proposition that juror exposure to . . . news accounts of the crime . . . alone presumptively deprives the defendant of due process." *Skilling v. United States*, 561 U.S. 358, 380 (2010) (citation and internal quotation marks omitted). The Fifth Circuit has accordingly held that a habeas petitioner "seeking to have his conviction nullified on the ground that he was denied a fair trial to an impartial jury due to adverse pretrial publicity ordinarily must demonstrate an actual, identifiable prejudice attributable to that publicity on the part of members of his jury." *Mayola v. Alabama*, 623 F.2d 992, 996 (5th Cir. 1980) (citing *Irvin*, 366 U.S. at 723).

In the present case, Cortez does nothing more than show that there was extensive pretrial publicity in the media. He then asks this Court to presume that he was denied his right to an impartial jury. The Supreme Court rejected this type of approach as follows:

Petitioner's argument that the extensive coverage by the media denied him a fair trial rests almost entirely upon the quantum of publicity which the events received. He has directed us to no specific portions of the record, in particular the *voir dire* examination of the jurors, which would require a finding of constitutional unfairness as to the method of jury selection or as to the character of the jurors actually selected. But under *Murphy*, extensive knowledge in the

> community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair. Petitioner in this case has simply shown that the community was made aware of the charges against him and asks us on that basis to presume unfairness of constitutional magnitude at his trial. This we will not do in the absence of a "trial atmosphere . . . utterly corrupted by press coverage," *Murphy*, 421 U.S. at 798.

*Dobbert v. Florida*, 432 U.S. 282, 303 (1977). The Fifth Circuit has accordingly held that "presumptive prejudice is only rarely applicable and is confined to those instances where the petitioner can demonstrate an extreme situation of inflammatory pretrial publicity that literally saturated the community in which his trial was held." *Busby v. Dretke*, 359 F.3d 708, 725-26 (5th Cir.) (citing *Mayola*, 623 F.2d at 997), *cert. denied*, 541 U.S. 1087 (2004). Cortez's case does not satisfy this standard. The quality and quantity of media coverage in this case is a far cry from the media-circuses that the courts have previously found problematic. Furthermore, Cortez has made no effort to demonstrate an actual, identifiable prejudice attributable to that publicity on the part of members of his jury. The claim lacks merit.

Claim number seven must be rejected for the additional reason that Cortez has not shown, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

**Claim Number 8:** **The trial court erred in denying Cortez's motion for new trial when the prosecutor's argument that proposed a question to the defendant directly in his face violated his Fifth Amendment right not to testify**

Cortez next alleges that the trial court erred in denying his motion for a new trial in response to the following portion of the prosecutor's closing arguments during the punishment phase of the trial:

MS. VOIRIN:     We all come face-to-face with evil at different times. Some of us see it and some of us don't. Some of us chose to ignore it.

70

|  |  |
|---|---|
|  | Evil takes on many forms. Sometimes it stares you square in the face defying for you to stop it. Sometimes it twists and morphs its o[w]n image into something that you think you can trust, maybe even feel sorry for. |
|  | There were glimpses of evil. A roommate with a revolver put to his head, an inexplicable gunshot wound to a 16 year-old child who knew she would die if she didn't escape. Do you think that she looked into his eyes as she shuttered and then shook it off? Will you? |
|  | You cannot breathe life into these lungs again, you cannot restore the beat in their hearts. There will be unanswered questions. We'll never know if Rosa struggled, did she fight -- |
| MR. PARKS: | Your Honor, we object to her addressing the defendant. |
|  | I would like the record to reflect that she walked across the room and looked at Mr. Cortez square in the eye and asked that question. |
|  | He has a right not to testify, he has a right not to have her point that out. |
|  | We object to the fact that she asked him a direct question in violation of the Fifth Amendment. |
| THE COURT: | I will sustain the objection. |
| MR. PARKS: | We would ask that the jury be instructed to disregard it. |
| THE COURT: | I ask you to disregard confronting the defendant. |
| MR. PARKS: | We would respectfully move for a mistrial. |
| THE COURT: | That will be denied. |

49 RR 89-90. Cortez correctly observes that the Fifth Amendment generally prohibits a prosecutor from making adverse comments about a defendant's decision not to testify at trial. *Griffin v. California*, 380 U.S. 609, 614 (1965). He argues that the prosecutor's comment on his failure to testify offends both the State and Federal Constitutions, as well as Texas statutory law, and denied him a fair trial without direct reference to his failure to testify.

The Director, in response, questions whether the prosecutor's rhetorical question may actually be characterized as a comment on Cortez's failure to testify. He correctly observed that Cortez, in fact, testified during the guilt/innocence phase of the trial. 47 RR 45-116. Cortez denied having anything to do with the murders. *Id.* at 89. The prosecutor expressly asked Cortez what were Rosa Barbosa's last words. *Id.* at 96. Cortez responded by saying that he "had absolutely nothing to do with those murders." *Id.* The Director correctly observed that a prosecutor at the sentencing phase of a trial is entitled to refer to the evidence given during the guilt/innocence phase of a trial. *Banda v. State*, 890 S.W.2d 42, 51 (Tex. Crim. App. 1994) ("In its determination of the special issues, the jury was entitled to consider all of the evidence presented at the guilt/innocence phase of the trial, in addition to the evidence presented at the punishment phase."), *cert. denied*, 515 U.S. 1105 (1995). The Director ultimately argued that Cortez has not shown that he is entitled to relief because he failed to show that the Texas Court of Criminal Appeals unreasonably applied Supreme Court precedent.

The Texas Court of Criminal Appeals rejected the present claim as follows:

> The trial judge sustained the objection, and upon defense counsel's request, the judge instructed the jury to disregard the statement. Defense counsel then moved for a mistrial, but the judge denied the request.

> When determining whether the judge erred in the context of punishment, we consider three factors: (1) the severity of the misconduct; (2) the measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge); and (3) the certainty of the assessed punishment absent the misconduct (the strength of the evidence supporting the punishment assessed).

> Assuming that the prosecutor's remark, coupled with her demeanor towards Cortez, amounted to a comment on, or inference about, Cortez's failure to testify, we begin by observing that the complained-of conduct was a extremely brief. Further, the trial judge immediately sustained defense counsel's objection and then, at the defense's request, instructed the jury to "disregard" the prosecutor's conduct. Again, we presume that they followed the judge's orders. Further, considering the strong evidence establishing that Cortez would be a future danger, as shown below, it is reasonable to conclude that the jury would have assessed

> a death sentence even in the absence of the prosecutor's conduct. We therefore overrule this point of error.

*Cortez v. State*, 2011 WL 4088105, at *23.

In analyzing claim number eight, it is clear that both sides agree that a prosecutor may not comment upon a defendant's failure to testify. *Griffin*, 380 U.S. at 614. The Supreme Court, however, has declined to extend *Griffin* to cases where a defendant actually testified. *Portuondo v. Agard*, 529 U.S. 61, 65 (2000). A prosecutor may comment on a defendant's "*credibility as a witness." Id.* at 69. Such comments are "in accord with [the] longstanding rule that when a defendant takes the stand, 'his credibility may be impeached and his testimony assailed like that of any other witness.'" *Id.* (quoting *Brown v. United States*, 356 U.S. 148, 154 (1958)). Taken together, *Griffin* and *Agard* stand for the proposition that while a prosecutor may not imply that the defendant is guilty by using his silence against him, the prosecutor may challenge the defendant's credibility by addressing his testimony.

In the present case, Cortez testified during the guilt/innocence phase of the trial. He denied having anything to do with the murders. The prosecutor was thus free to comment on Cortez's credibility. Her statement did not violate *Griffin*. Furthermore, to the extent that Cortez seeks to extend *Griffin* to the present situation, he is attempting to rely on a new rule of law, which is barred by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989).

The Court would add that the actual meaning of the prosecutor's statement is somewhat ambiguous. It could have easily been interpreted as a statement that no one will ever know what Rosa Barbosa was thinking since Cortez killed her. The statement should be considered in context. The jury had already found him guilty. The jury had already rejected Cortez's claim that he did not have anything to do with the murders. The prosecutor's rhetorical question was made in the context of the jury having to decide the appropriate punishment that should be imposed.

The Texas Court of Criminal Appeals, however, chose to forego deciding whether the prosecutor's remark amounted to a comment on, or an inference about, Cortez failing to testify. Instead, the analysis focused on harm. The Fifth Circuit has found that habeas relief is unavailable if the error was harmless. *Cotton v. Cockrell*, 343 F.3d 746, 752 (5th Cir. 2003) ("Given the overwhelming evidence of guilt and the court's cautionary instructions to the jury, we conclude that the prosecutor's statement had no substantial and injurious effect or influence in the determination of [petitioner's] guilt."), *cert. denied*, 540 U.S. 1186 (2004); *Nethery v. Collins*, 993 F.2d 1154, 1159 (5th Cir. 1993) (same), *cert. denied*, 511 U.S. 1026 (1994). The Texas Court of Criminal Appeals found that Cortez was not entitled to relief because of the brevity of the alleged misconduct, the curative instruction and the strong evidence that he was a future danger. Cortez has made no effort to challenge the reasonableness of the decision by the Texas Court of Criminal Appeals. As such, claim number eight must be rejected for the additional reason that Cortez has not shown, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

**Claim Number 9:** **The statute under which Cortez was sentenced to death is unconstitutional in violation of the Cruel and Unusual Punishment Prohibition of the Eighth Amendment**

Cortez next argues that the statute under which he was sentenced to die allows the jury too much discretion in determining who should live and die because it lacks the minimal standards and guidance necessary for the jury to avoid the arbitrary and capricious imposition of the death penalty. He argued that the evolution of the death penalty has come full circle because, under the present Texas statute as applied to him, the jury has once again been given unfettered discretion that both invites and

74

permits arbitrary application of the ultimate penalty. *Cf. Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (plurality op.) ("*Furman*[3] mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.").

The Texas Court of Criminal Appeals rejected the claim on direct appeal as follows:

> In point of error thirty-two, Cortez contends that the death penalty statute permits cruel and unusual punishment because it gives jurors too much discretion in determining who lives or dies. We have repeatedly rejected this claim, and Cortez presents nothing to persuade us to overrule these prior cases. Therefore, we overrule this point of error.

*Cortez v. State*, 2011 WL 4088105, at *25 (citing *Coble v. State*, 330 S.W.3d 253, 297 (Tex. Crim. App. 2010)). Cortez has made no effort to show, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Relief must be denied because he has not satisfied § 2254(d).

The claim must also be rejected because it lacks merit under clearly established federal law. The Supreme Court distinguished between two aspects of the capital sentencing decision, more specifically, the eligibility decision and the selection decision, in *Tuilaepa v. California*, 512 U.S. 967, 971-72 (1994). The Supreme Court has repeatedly upheld the constitutionality of Texas' procedures for determining the existence of aggravating circumstances to make eligibility decisions. *See Jurek v. Texas*, 428 U.S. 262, 276 (1976); *see also Sonnier v. Quarterman*, 476 F.3d 349, 366-67 (5th Cir.), *cert. denied*, 552 U.S. 948 (2007). In making the selection decision, the jury must be allowed to make "an *individualized* determination" by considering "relevant mitigating evidence of the character and

---

[3]*Furman v. Georgia*, 408 U.S. 238 (1972).

record of the defendant and the circumstances of the crime." *Tuilaepa*, 512 U.S. at 972. A jury "may be given 'unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty.'" *Id.* at 979-80 (quoting *Zant v. Stephens*, 462 U.S. 862, 875 (1983)). In exercising its discretion, the jury "need not be instructed how to weigh any particular fact in the capital sentencing decision." *Id.* at 979. Since the issuance of the decision in *Tuilaepa*, the Fifth Circuit regularly rejected complaints that juries in Texas have unbridled discretion in determining who should live or die. *See, e.g., Sprouse v. Stephens*, 748 F.3d 609, 621-22 (5th Cir.), *cert. denied*, 135 S. Ct. 477 (2014); *Turner v. Quarterman*, 481 F.3d 292, 299 (5th Cir. 2007), *cert. denied*, 551 U.S. 1193 (2007); *Woods v. Cockrell*, 307 F.3d 353, 359 (5th Cir. 2002); *Moore v. Johnson*, 225 F.3d 495, 506-07 (5th Cir. 2000) ("Texas followed Supreme Court instructions to the letter"), *cert. denied*, 532 U.S. 949 (2001). The claim lacks merit under clearly established federal law and must be rejected.

> **Claim Number 10:** **The statute under which Cortez was sentenced to death is unconstitutional in violation of the Eighth Amendment as interpreted by *Penry v. Johnson* because the mitigation special issue sends mixed signals to the jury thereby rendering any verdict reached in response to the special issue intolerable and unreliable**

Cortez argues that this Court should hold that the Texas death penalty scheme violates the Eighth Amendment in light of the Supreme Court's decision in *Penry v. Johnson*, 532 U.S. 782 (2001) (hereinafter "*Penry II*"). While acknowledging that the opinion in that case repudiated a judicially-crafted mitigation instruction, Cortez asserts that the statutory mitigation special issue given in his case is also vulnerable to the criticism that it sends "mixed signals" to the jury. He argues that the mixed signals to the jury thereby renders any verdict reached in response to the special issue intolerable and unreliable.

The Texas Court of Criminal Appeals rejected the claim on direct appeal as follows:

> In point of error thirty-three, Cortez claims that the death-penalty statute violates the Eighth Amendment because the mitigation special issue sends mixed signals to the jury. We have previously considered the current capital-sentencing statute and have held that the instructions allow jurors to give meaningful consideration and effect to mitigating evidence in accordance with federal law. Cortez provides us with no new argument that persuades us to reconsider our holdings. Point of error thirty-three is overruled.

*Cortez v. State*, 2011 WL 4088105, at *25 (citing *Busby v. State*, 253 S.W.3d 661, 667 (Tex. Crim. App. 2008); *Saldano v. State*, 232 S.W.3d 77, 107-09 (Tex. Crim. App. 2007)). Claim number ten is presented in the exact same way it was presented to the Texas Court of Criminal Appeals as point of error thirty-three. Cortez has made no effort to show, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Cortez simply repeats the claim verbatim without trying to satisfy § 2254(d). Relief is unavailable because he has not satisfied the requirements of § 2254(d).

The claim must be rejected for the additional reason that it lacks merit under clearly established federal law. The Fifth Circuit rejected this precise argument in *Oliver v. Quarterman*, 254 F. App'x 381 (5th Cir. 2007). The following explanation was provided:

> In *Penry II,* the Supreme Court struck down a judicially crafted jury instruction because it was confusing and, in effect, required the jury to answer the special issues dishonestly in order to give effect to the defendant's mitigating evidence. *Id.* at 801, 121 S.Ct. 1910. The Court rejected the instruction as sending "mixed signals" to the jury. *Id.* at 802, 121 S.Ct. 1910. The Court, however, implicitly upheld Texas's current scheme:
>
> > A clearly drafted catchall instruction on mitigating evidence also might have complied with [the Court's precedents]. Texas' current capital sentencing scheme (revised after Penry's second trial and sentencing) provides a helpful frame of reference. Texas now requires the jury to decide "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating

circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." TEX.CODE CRIM. PROC. ANN. art. 37.071(2)(e)(1) (Vernon Supp. 2001).... At the very least, the brevity and clarity of this instruction highlight the confusing nature of the supplemental instruction actually given, and indicate that the trial court had adequate alternatives available to it as it drafted the instructions for Penry's trial.

*Id.* at 803, 121 S. Ct. 1910. Far from rejecting the current scheme regarding mitigation, therefore, the Supreme Court implicitly endorsed it. *See, e.g., Coleman v. Quarterman,* 456 F.3d 537, 542 (5th Cir.2006), *cert denied,* 549 U.S. 1343, 127 S. Ct. 2030, 167 L.Ed.2d 772 (2007) (quoting *Rowell,* 398 F.3d at 378) ("[N]o Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof."). Oliver has failed to make any plausible argument that Texas's mitigation special issue does not allow the jury to consider and give effect to a defendant's mitigating evidence. Oliver also points to no other cases to support his position.

*Id.* at 386-87. In light of the decision in *Oliver*, Cortez's argument that Texas' current scheme should be rejected as unconstitutional lacks merit. More recently, the Fifth Circuit rejected the argument again in *White v. Thaler*, 522 F. App'x 226, 234 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 907 (2014). In *White*, the Court also upheld the district court's conclusion that the "claim is *Teague*-barred." *Id.* Cortez simply is not entitled to relief on this claim.

**Claim Number 11:**   **The statute under which Cortez was sentenced to death is unconstitutional in violation of the due process requirements of the Fourteenth Amendment**

Cortez next claims that the statute under which he was sentenced to death violates the Fourteenth Amendment because it implicitly places the burden of proving the mitigation special issue on him rather than requiring the jury to find against him on that issue "beyond a reasonable doubt." He argues that the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), necessitates a finding that the Texas death penalty scheme is unconstitutional because it does not place the burden of proof on the State that would require the jury to find beyond a reasonable doubt that there are no mitigating circumstances sufficient to warrant the imposition of a life sentence rather than death.

The Texas Court of Criminal Appeals rejected the claim on direct appeal as follows:

In Cortez's thirty-fourth point of error, he contends that the death-penalty statute violates due process requirements because it implicitly puts the burden of proof on the defendant with respect to the mitigation special issue. We have observed that the State does not bear any burden of proof on the mitigation issue and that the statute setting out that issue and instructions is constitutional. We decline Cortez's invitation to overrule establish law. We overrule his thirty-fourth point of error.

*Cortez v. State*, 2011 WL 4088105, at *25 (citing *Mays v. State*, 318 S.W.3d 368, 397 (Tex. Crim. App. 2010); *Whitaker v. State*, 286 S.W.3d 355, 370 (Tex. Crim. App. 2009); *Busby*, 253 S.W.3d at 667). Claim number eleven is presented in the exact same way it was presented to the Texas Court of Criminal Appeals as point of error thirty-four. Cortez has made no effort to show, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Cortez simply repeats the claim verbatim without trying to satisfy § 2254(d). Relief is unavailable because he has not satisfied the requirements of § 2254(d).

The claim should be also rejected because it lacks merit. Cortez's argument was rejected by the Fifth Circuit in *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir.) ("No Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof."), *cert. denied*, 546 U.S. 848 (2005). Since deciding *Rowell*, the Fifth Circuit has repeatedly held that claims regarding the failure to assign either party the burden of proof on the mitigation special issue are meritless. *Blue*, 665 F.3d at 668; *Druery v. Thaler*, 647 F.3d 535, 546 (5th Cir. 2011), *cert. denied*, 132 S. Ct. 1550 (2012); *Adams v. Thaler*, 421 F. App'x 322, 334 (5th Cir.), *cert. denied*, 132 S. Ct. 399 (2011); *Kerr v. Thaler*, 384 F. App'x 400, 403 (5th Cir. 2010), *cert. denied*, 562 U.S. 1142

(2011). *See also Avila v. Quarterman*, 560 F.3d 299, 315 (5th Cir. 2009) (The Fifth Circuit observed that it was bound by its precedent on this issue). The ground for relief lacks merit. Moreover, since Fifth Circuit precedent was clearly established on this issue by the time the present petition was filed, the inclusion of the claim was disingenuous.

> **Claim Number 12:** **The trial court erred in denying Cortez's motion to hold Article 37.071 Sec. 2(e) and (f) concerning burden of proof unconstitutional as a violation of Article One Sec. 10 and Sec. 13 of the Texas Constitution.**

In claim number twelve, Cortez complains that the trial court denied his motion to hold articles 37.071 Sec. 2(E) and (F) unconstitutional under the Texas Constitution. The Texas Court of Criminal Appeals rejected the claim. *Cortez v. State*, 2011 WL 4088105, at *25 (citing *Saldano*, 232 S.W.3d at 107-109). Cortez has made no effort to show, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Cortez simply repeats the claim verbatim without trying to satisfy § 2254(d). Relief is unavailable because he has not satisfied the requirements of § 2254(d).

In addition to the foregoing, the claim lacks merit for a more fundamental reason for purposes of federal habeas corpus proceedings. Unless a federal issue is also presented, federal habeas corpus relief will not issue to correct errors of state constitutional, statutory or procedural law. *McGuire*, 502 U.S. at 67-68. A federal court simply does "not sit as a super state supreme court to review error under state law." *Wood*, 503 F.3d at 414. Cortez has not raised a claim based on federal law; thus, he has not raised a claim cognizable in federal habeas corpus proceedings.

**Claim Number 13:** **The Texas death penalty scheme violates due process protections because the punishment special issue related to mitigation fails to require the State to prove the absence of sufficient mitigating circumstances beyond a reasonable doubt, contrary to *Apprendi* and its progeny**

In claim number thirteen, Cortez presents a variation of claim number eleven. He argues that the Texas death penalty scheme violates due process because the special issue related to mitigation fails to require the State to prove the *absence* of sufficient mitigating circumstances beyond a reasonable doubt, contrary to *Apprendi* and its progeny. In support of the claim, he also cites *Ring v. Arizona*, 536 U.S. 584 (2002).

The Texas Court of Criminal Appeals rejected the claim on direct appeal as follows:

In point of error thirty-six, Cortez contends that the death-penalty is unconstitutional because the mitigation issue fails to require the State to prove the absence of mitigating circumstances beyond a reasonable doubt. We have also rejected this claim and conclude that there is no reason to revisit here. Point of error thirty-six is overruled.

*Cortez v. State*, 2011 WL 4088105, at *25 (citing *Saldano*, 232 S.W.3d at 107-09). Claim number thirteen is presented in the exact same way it was presented to the Texas Court of Criminal Appeals as point of error thirty-six. Cortez has made no effort to show, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Cortez simply repeats the claim verbatim without trying to satisfy § 2254(d). Relief is unavailable because Cortez has not satisfied the requirements of § 2254(d).

The claim should be also rejected because it lacks merit in light of clearly established circuit precedent. The Fifth Circuit has "specifically held that the Texas death penalty scheme did not violate

81

either *Apprendi* or *Ring* by failing to require the state to prove beyond a reasonable doubt the *absence* of mitigating circumstances." *Scheanette v. Quarterman*, 482 F.3d 815, 828 (5th Cir. 2007) (emphasis added). Following *Scheanette*, the Fifth Circuit repeatedly rejected this same argument. *Allen v. Stephens*, 805 F.3d 617, 626-28 (5th Cir. 2015); *Sprouse*, 748 F.3d at 623; *Cobb v. Thaler*, 682 F.3d 364, 381 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 933 (2013); *Blue*, 665 F.3d 668-69; *Ortiz v. Quarterman*, 504 F.3d 492, 504-05 (5th Cir. 2007). The ground for relief lacks merit. Moreover, since Fifth Circuit precedent was clearly established on this issue by the time the present petition was filed, the inclusion of the claim was disingenuous.

> **Claim Number 14:** **The Texas death penalty scheme violated Cortez's rights against cruel and unusual punishment and due process of law under the Eighth and Fourteenth Amendments by requiring at least ten "no" votes for the jury to return a negative answer to the punishment special issues**

Cortez's fourteenth ground for relief concerns Texas' 12-10 rule, which purportedly violates *Mills v. Maryland*, 486 U.S. 367 (1988). He argues that potential holdout jurors may reasonably believe that their votes in favor of a life sentence are worthless unless nine others join them. If a majority of other votes are firmly voting "yes," holdouts may feel obligated to vote "yes" since there would appear to be no possibility of a life sentence and the jury has been instructed to return a verdict. *Mills*, 486 U.S. at 383 ("common sense . . . suggest[s] that juries do not leave blanks and do not report themselves as deadlocked over mitigating circumstances after reasonable deliberation [citation omitted] unless they are expressly instructed to do so.").

The Texas Court of Criminal Appeals rejected the claim on direct appeal as follows:

In point of error thirty-seven, Cortez alleges that the death-penalty scheme violated his rights against cruel and unusual punishment and due process of law by requiring at least ten "no" votes for the jury to return a negative answer to the future dangerousness issue. We have

previously decided this issue adversely to Cortez's contention. Cortez presents nothing to persuade us to reconsider the issue. Point of error thirty-seven is overruled.

*Cortez v. State*, 2011 WL 4088105, at *25 (citing *Crutsinger v. State*, 206 S.W.3d 607, 613 (Tex. Crim. App. 2006); *Escamilla*, 143 S.W.3d at 828; *Masterson v. State*, 155 S.W.3d 167, 175 (Tex. Crim. App. 2005)). Claim number fourteen is presented in the exact same way it was presented to the Texas Court of Criminal Appeals as point of error thirty-seven. Cortez has made no effort to show, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Cortez simply repeats the claim verbatim without trying to satisfy § 2254(d). Relief is unavailable because Cortez has not satisfied the requirements of § 2254(d).

Claim number fourteen should also be denied because the Fifth Circuit has found that it lacks merit. "In *Mills*, the Supreme Court held that the Eighth Amendment was violated because the jury instructions may have precluded the jury from considering mitigating evidence unless all twelve jurors agreed that a particular circumstance was supported by the evidence." *Miller*, 200 F.3d at 288 (citing *Mills*, 486 U.S. at 384). The Fifth Circuit held "that *Mills* is not applicable to the capital sentencing scheme in Texas." *Id.* "Under the Texas system, all jurors can take into account any mitigating circumstance. One juror cannot preclude the entire jury from considering a mitigating circumstance." *Id.* at 288-89 (citing *Jacobs v. Scott*, 31 F.3d 1319, 1329 (5th Cir. 1994)). Since deciding *Miller*, the Fifth Circuit has repeatedly rejected challenges to Texas' capital sentencing provisions based on *Mills*. *See, e.g., Druery*, 647 F.3d at 542-43; *Parr v. Thaler*, 481 F. App'x 872, 878-79 (5th Cir. 2012); *Adams*, 421 F. App'x. at 335. Relief based on *Mills* is unavailable. Cortez's challenge to the 12-10

rule lacks merit in light of clearly established Fifth Circuit precedent. Cortez is not entitled to relief on claim number fourteen.

**Claim Number 15:** **The Texas death penalty scheme violated Cortez's rights against cruel and unusual punishment, an impartial jury, and to the due process of law under the Eighth, Sixth and Fourteenth Amendments because of vague, undefined terms in the jury instructions at the punishment phase that effectively determine the difference between a life sentence and the imposition of the death penalty**

In claim number fifteen, Cortez argues that the Texas death penalty scheme is unconstitutional because of vague and undefined terms in the jury instructions during the punishment phase of the trial. More specifically, Cortez complains that the jury instructions and special issues did not define "probability," "continuing threat to society," and "criminal acts of violence."

The Texas Court of Criminal Appeals rejected the claim on direct appeal as follows:

Next, Cortez complains, in his thirty-eighth point of error, that the death-penalty statute is unconstitutional because critical terms in the statute are undefined and are therefore vague and indefinite. Specifically, Cortez points to the terms "probability," "continuing threat to society," and "criminal acts of violence." We have also rejected this claim, and we see no reason to reconsider it at this juncture. We overrule this point of error.

*Cortez v. State*, 2011 WL 4088105, at *25 (citing *Resendiz v. State*, 112 S.W.3d 541, 551 (Tex. Crim. App. 2004). Claim number fifteen is presented in the exact same way it was presented to the Texas Court of Criminal Appeals as point of error thirty-eight. Cortez has made no effort to show, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Cortez simply repeats the claim verbatim without trying to satisfy § 2254(d). Relief is unavailable because Cortez has not satisfied the requirements of § 2254(d).

84

The claim should also be denied because it lacks merit in light of clearly established federal law as decided by the Fifth Circuit. The terms "probability," "continuing threat to society," and "criminal acts of violence," have a "common-sense core of meaning and that criminal juries should be capable of understanding them." *Paredes v. Quarterman*, 574 F.3d 281, 294 n.17 (5th Cir. 2009) (citing *Jurek*, 428 U.S. at 279 (White, J., concurring)). More recently, the Fifth Circuit rejected the same basic claim yet again with the following explanation:

> In this claim, Rivas complains that his due process rights were violated by the trial court's instructions to the jury with special issues that contained allegedly vague and undefined terms. Specifically, Rivas complains of the trial court's failure to define the terms "probability," "criminal acts of violence," and "continuing threat to society," included in the first special issue submitted to the jury. As with his previous claim, Rivas acknowledges that this claim is foreclosed by circuit precedent holding that these terms are not unconstitutionally vague and that their meanings may be readily understood. *See, e.g., Woods v. Johnson*, 75 F.3d 1017, 1033-34 (5th Cir. 1996); *James v. Collins*, 987 F.2d 1116, 1119-20 (5th Cir. 1993); *Nethery v. Collins*, 993 F.2d 1154, 1162 (5th Cir. 1993). Rivas again maintains this argument to preserve it for further review. We deny a COA on this claim.

*Rivas v. Thaler*, 432 F. App'x 395, 405 (5th Cir.) (footnote omitted), *cert. denied*, 132 S. Ct. 850 (2011). The cases cited by the Fifth Circuit reveal that this issue was settled in the 1990s. Moreover, the Director persuasively argued that the claim is *Teague*-barred. Cortez is not entitled to relief on claim number fifteen.

**Claim Number 16:**      **The Texas death penalty scheme denied Cortez due process of law and imposed cruel and unusual punishment in violation of the Fifth, Eighth, and Fourteenth Amendments because of the impossibility of simultaneously restricting the Jury's discretion to impose the death penalty while also allowing the jury unlimited discretion to consider all evidence militating against imposition of the death penalty.**

**Claim Number 17:**      **The Texas death penalty scheme denied Cortez due course of law and imposed cruel and unusual punishment in violation of Article I, §§ 13 and 19 of the Texas Constitution because of the impossibility of simultaneously restricting the Jury's discretion to impose the death penalty while also allowing the jury unlimited**

**discretion to consider all evidence militating against imposition of the death penalty.**

Claims sixteen and seventeen allege that the Texas death penalty violates Cortez's constitutional rights because of the impossibility of simultaneously restricting the jurors' discretion in imposing a death sentence while granting the jurors unlimited discretion in considering mitigation. Claim number sixteen focuses on the Fifth, Eighth and Fourteenth Amendments, while claim number seventeen focuses on the Texas Constitution. Cortez supports his claims by quoting a lengthy dissenting opinion by Justice Blackmun in *Callins v. Collins*, 510 U.S. 1141 (1994). He stresses that Justice Blackmun stated that the death penalty must be fairly administered with reasonable consistency, or not at all, in order to comply with the mandates of Eighth Amendment. *Id.* at 1144.

The Texas Court of Criminal Appeals rejected the claim on direct appeal as follows:

> In points of error thirty-nine and forty, Cortez alleges that the death-penalty scheme violates his federal and state constitutional rights because it is impossible for the jury to simultaneously restrict the jury's discretion to impose the death penalty while also allowing the jury to consider mitigating evidence against the imposition of the death penalty. We have previously determined that these claims are without merit, and Cortez does not convince us otherwise. Points of error thirty-nine and forty are overruled.

*Cortez v. State*, 2011 WL 4088105, at *26 (citing *Saldano*, 232 S.W.3d at 108-09). Claim numbers sixteen and seventeen are presented in the exact same way they were presented to the Texas Court of Criminal Appeals. Cortez has made no effort to show, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Cortez simply repeats the claim verbatim without trying to satisfy § 2254(d). Relief is unavailable because Cortez has not satisfied the requirements of § 2254(d).

Claim numbers sixteen and seventeen must be rejected for the additional reason that they lack merit under clearly established federal law. As explained in conjunction with claim number nine, the Supreme Court distinguished between two aspects of the capital sentencing decision, more specifically, the eligibility decision and the selection decision, in *Tuilaepa*, 512 U.S. at 971-72. The Supreme Court has repeatedly upheld the constitutionality of Texas' procedures for determining the existence of aggravating circumstances to make eligibility decisions. *See Jurek*, 428 U.S. at 276; *see also Sonnier*, 476 F.3d at 366-67. In making the selection decision, the jury must be allowed to make "an *individualized* determination" by considering "relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime." *Tuilaepa*, 512 U.S. at 972. A jury "may be given 'unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty.'" *Id.* at 979-80 (quoting *Zant*, 462 U.S. at 875). Contrary to Cortez's argument, these are two separate aspects of a death penalty case that are conducted at different times during the proceedings, as opposed to issues that are simultaneously considered by the jury. Finally, Justice Blackmun's dissenting opinion in *Callins* has never been accepted, and the Fifth Circuit has observed that reasonable jurists could not debate a district court's decision rejecting such arguments. *Bigby v. Stephens*, 595 F. App'x 350, 355 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 2359 (2015); *Hughes v. Dretke*, 412 F.3d 582, 594 (5th Cir. 2005), *cert. denied*, 546 U.S. 1177 (2006). Moreover, even if the claim had merit, the Fifth Circuit observed that it would be *Teague*-barred. *Hughes*, 412 F.3d at 594.

Finally, with respect to claim number seventeen, the Director correctly observed that Cortez focuses on state law issues, which are not cognizable in federal habeas proceedings. *See McGuire*, 502 U.S. at 67-68; *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Pulley v. Harris*, 465 U.S. 37, 41 (1984). Cortez is not entitled to relief on claims sixteen and seventeen.

**Claim number 18:** **The trial court erred in overruling Cortez's motion to hold Article 37.071 Sec. 2(e) and (f) unconstitutional because it fails to require the issue of mitigation be considered by the jury (CR: 1370-1373)**

Cortez next argues that Article 37.071 § 2(e) & (f) of the Texas Code of Criminal Procedure is unconstitutional because the statute does not require the issue of mitigation be considered by the jury. He asserts that the Constitution requires jurors to consider "all mitigating evidence." *Johnson v. Texas*, 509 U.S. 350 (1993); *Boyde v. California*, 494 U.S. 370 (1990); *Blystone v. Pennsylvania*, 494 U.S. 299 (1990).

The Texas Court of Criminal Appeals rejected the claim on direct appeal as follows:

In point of error forty-one, Cortez contends that the trial judge erred in overruling his motion to hold Article 37.071 Sections 2(e) and (f) unconstitutional because it fails to require the mitigation issue be considered by the jury. We have also rejected this claim in the past, and we refuse to reconsider it now. Point of error forty-one is therefore overruled.

*Cortez v. State*, 2011 WL 4088105, at *26 (citing *Saldano*, 232 S.W.3d at 108-09). Claim number eighteen is presented in the exact same way it was presented to the Texas Court of Criminal Appeals as point of error forty-one. Cortez has made no effort to show, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Cortez simply repeats the claim verbatim without trying to satisfy § 2254(d). Relief is unavailable because Cortez has not satisfied the requirements of § 2254(d).

The claim must also be rejected because the record does not support the claim. After the jurors made their eligibility determination, that is, finding Cortez guilty of capital murder (3 CR 1053), and after they unanimously found that he posed a continuing threat to society (3 CR 1099), and that he

embarked upon the crime with murder in mind (3 CR 1100), then the jurors were specifically asked the mitigation question. The jurors were asked "[d]o you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Raul Cortez, that there is sufficient mitigating circumstance or circumstances to warrant a sentence of life imprisonment rather than a death sentence be imposed?" (3 CR 1101). The jury responded with the answer, "NO." *Id.* Contrary to Cortez's assertion, the jury was asked the mitigating evidence question and decided it against him.

The claim also lacks merit in light of clearly established Fifth Circuit precedent. The Fifth Circuit recently found that "*all* mitigating evidence can be given effect under the broad definition of mitigating evidence found in [§2(e)]." *White*, 522 F. App'x at 235 (citation omitted). *See also Blue*, 665 F.3d at 666; *Beazley*, 242 F.3d at 259 (the amended statute does not unconstitutionally preclude the jury from considering, as a mitigating factor, any aspect of a defendant's character or record and any circumstances of the offense that the defendant proffers as a basis for a sentence less than death). Relief is unavailable on claim number eighteen.

**Claim Number 19:** **The statutory "*Penry*" special issue in Tex. Code Crim. Pro. Arts. 37.071 & 37.0711 is unconstitutional because it fails to place the burden of proof on the State regarding aggravating evidence**

In claim number nineteen, Cortez argues that Articles 37.071 and 37.0711 of the Texas Code of Criminal Procedure are unconstitutional. Citing *Walton v. Arizona*, 497 U.S. 639 (1990), he alleges that because the Texas statute fails to place the burden of proving "aggravating factors" upon the State expressly, the statute is unconstitutional. Cortez also cites *Johnson v. Texas*, 509 U.S. 350 (1993) (describing jurors' determination of answer to "future dangerousness" special issue to require balancing of aggravating and mitigating circumstances).

The Texas Court of Criminal Appeals rejected the claim on direct appeal as follows:

In his forty-second point of error, Cortez claims that the mitigation special issue is unconstitutional because it fails to place the burden of proof on the State to prove aggravating evidence. We have previously rejected this claim as well. There is no reason for us to reconsider our prior decisions here; therefore, point of error forty-two is overruled.

*Cortez v. State*, 2011 WL 4088105, at *26 (citing *Saldano*, 232 S.W.3d at 108-09). Claim number nineteen is presented in the exact same way it was presented to the Texas Court of Criminal Appeals. Cortez has made no effort to show, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. He simply repeats the claim verbatim without trying to satisfy § 2254(d). Relief is unavailable because Cortez has not satisfied the requirements of § 2254(d).

The claim should be rejected for the additional reason that it lacks merit and misrepresents the nature of Texas law. Arizona's system in *Walton* is described as a "weighing" system, in which the sentencer weighs the statutory aggravating factors against the non-statutory mitigating factors. The burden of establishing the existence of aggravating factors lays on the prosecution. *Walton*, 497 U.S. at 643. Texas's capital sentencing scheme, on the other hand, makes it a "non-weighing state" in that it does not require the jury to "weigh" aggravating factors against mitigating factors. *Hughes v. Johnson,* 191 F.3d 607, 623 (5th Cir.1999), *cert. denied,* 528 U.S. 1145 (2000). In non-weighing states, "statutory aggravating factors serve principally to address the concerns of the Eighth Amendment - that is, the role of the statutory aggravators is to narrow and channel the jury's discretion by separating the class of murders eligible for the death penalty from those that are not." *Id.* (citation omitted). In Texas, the jury considers aggravating factors in the guilt-innocence phase of the trial

where the defendant's eligibility for a death sentence is determined. *Woods,* 307 F.3d at 359. If eligibility for a death sentence is determined, then the case proceeds to the punishment phase of the trial. *Id.* During the punishment phase, the jury selects either death or life imprisonment. *Id.* The final question asks the jury "whether the defendant's mitigating evidence is sufficient to warrant the imposition of a life sentence rather than the death penalty." *Id.* Cortez's claim reveals a basic misunderstanding of weighing versus non-weighing states. It reveals a basic misunderstanding of Texas law. It is devoid of merit.

Cortez's focus on *Johnson* is likewise misplaced. *Johnson* concerned an older (pre-1991) version of the Texas sentencing scheme that existed before the Supreme Court issued *Penry v. Lynaugh*, 492 U.S. 302 (1989) (hereinafter *Penry I*). Just like the situation in *Penry I*, the jury charge in *Johnson* did not include a mitigation special issue. In 1991, the Texas Legislature amended the statute regarding the sentencing scheme as a result of *Penry I*. *Johnson*, 509 U.S. at 353 n.1. Cortez was not convicted pursuant to the pre-1991 version of the Texas sentencing scheme. His jury charge included a mitigation special issue. Overall, neither *Walton* nor *Johnson* have any applicability to Cortez's trial. Cortez is not entitled to relief on claim number nineteen.

**Claim Number 20: The statutory "*Penry*" special issue is unconstitutional under the Eighth and Fourteenth Amendments to the Constitution because it permits the very type of open-ended discretion condemned by the United States Supreme Court in *Furman v. Georgia***

In claim number twenty, Cortez argues that the statutory *Penry* special issue is unconstitutional because it allows the "open-ended discretion" barred by *Furman v. Georgia*, 408 U.S. 238 (1972). He observes that the Supreme Court specifically condemned the open-ended, unstructured discretion that was given to capital sentencing juries. *See also Gregg v. Georgia*, 428 U.S. 153 (1976); *Spaziano v. Florida*, 468 U.S. 447 (1984). He acknowledges that the Texas Legislature established new special

issues following the issuance of *Penry I*, but he argues that the new special issues still permits the very type of open-ended discretion condemned in *Furman*. He further argues that rather than submitting an open-ended, unstructured sentencing issue, the Eighth Amendment requires a trial court in the sentencing phase of a capital case to instead submit a charge that adequately structures the jury's sentencing discretion regarding mitigation and aggravating factors.

The Texas Court of Criminal Appeals rejected the claim on direct appeal as follows:

> Cortez further complains, in point of error forty-three, that the mitigation issue is unconstitutional because it permits open-ended discretion. This claim, under our precedent, is without merit. Cortez fails to convince us to reconsider it here. Point of error forty-three is overruled.

*Cortez v. State*, 2011 WL 4088105, at *26 (citing *Saldano*, 232 S.W.3d at 108-09). Claim number twenty is presented in the exact same way it was presented to the Texas Court of Criminal Appeals. Cortez has made no effort to show, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. He simply repeats the claim without trying to satisfy § 2254(d). Relief is unavailable because Cortez has not satisfied the requirements of § 2254(d).

Moreover, the claim lacks merit in light of *Tuilaepa*. In making the selection decision, the jury must be allowed to make "an *individualized* determination" by considering "relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime." *Tuilaepa*, 512 U.S. at 972. A jury "may be given 'unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty.'" *Id.* at 979-80 (quoting *Zant*, 462 U.S. at 875). Since the issuance of the decision in

*Tuilaepa*, the Fifth Circuit regularly rejected complaints that juries in Texas have unbridled discretion in determining who should live or die. *See, e.g., Sprouse*, 748 F.3d at 621-22; *Turner*, 481 F.3d at 299; *Woods*, 307 F.3d at 359; *Moore*, 225 F.3d at 506-07 ("Texas followed Supreme Court instructions to the letter"). The claim lacks merit under clearly established law and must be rejected.

> **Claim Number 21:** **Texas' statutory capital sentencing scheme is unconstitutional under the Eighth and Fourteenth Amendments because it does not permit meaningful appellate review**

In claim number twenty-one, Cortez complains that the statutory *Penry* special issue does not specify the types of mitigating or aggravating factors relevant to a capital sentencing jury's deliberations during the punishment phase. Rather, the jury is simply asked whether there are "sufficient mitigating circumstance or circumstances" to warrant a life sentence rather than a death sentence. *See* Tex. Code Crim. Pro. arts. 37.071 and 37.0711 (West 1994). He argues that the open-ended and unstructured nature of Articles 37.071 and 37.0711 prevents meaningful appellate review.

The Texas Court of Criminal Appeals rejected the claim on direct appeal as follows:

> In point of error forty-four, Cortez claims that the capital sentencing scheme is unconstitutional because it does not allow for meaningful appellate review. This claim has also been rejected in the past. There is no reason to revisit it now. Point of error forty-four is overruled.

*Cortez v. State*, 2011 WL 4088105, at *26 (citing *Saldano*, 232 S.W.3d at 108-09). Claim number twenty-one is presented in the exact same way it was presented to the Texas Court of Criminal Appeals as point of error forty-four. Cortez has made no effort to show, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Cortez simply repeats the claim verbatim without

trying to satisfy § 2254(d).  Relief is unavailable because Cortez has not satisfied the requirements of § 2254(d).

Relief on claim number twenty-one should be denied for the additional reason that it lacks merit.  The Fifth Circuit has regularly rejected claims that argue that the Constitution requires the Texas Court of Criminal Appeals to review mitigating evidence.  *Rowell*, 398 F.3d at 378;  *Woods*, 307 F.3d at 359-60;  *Beazley*, 242 F.3d at 261;  *Moore*, 225 F.3d at 506-07.  More recently, the Fifth Circuit rejected this type of claim "because it is easily rejected on the merits."  *Adams*, 421 F. App'x at 336-37.  The claim is devoid of merit.

**Claim Number 22:      The trial court erred in overruling Cortez's second motion to set aside the indictment as being unconstitutional based on the enumerated constitutional defects of the Texas capital murder death penalty law**

In claim number twenty-two, Cortez argues that the trial court erred in overruling his second motion to set aside the indictment.  He asserts that he filed a motion to quash the indictment raising numerous constitutional issues concerning the death penalty, and the trial court denied the motion.

The Texas Court of Criminal Appeals rejected the claim on direct appeal as follows:

In point of error forty-five, Cortez also contends that the trial court erred in overruling his second motion to set aside the indictment as being unconstitutional based on defects in the capital sentencing scheme.  We have previously rejected this exact claim, and Cortez has not persuaded us to reevaluate it here.  Point of error forty-five is overruled.

*Cortez v. State*, 2011 WL 4088105, at *26 (citing *Saldano*, 232 S.W.3d at 108-09).  Claim number twenty-two is presented in the exact same way it was presented to the Texas Court of Criminal Appeals as point of error forty-five.  Cortez has made no effort to show, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the

evidence presented in the state court proceedings. Cortez simply repeats the claim verbatim without trying to satisfy § 2254(d). Relief is unavailable because Cortez has not satisfied the requirements of § 2254(d).

The claim must be rejected for the additional reason that the Supreme Court has never held that the indictment provisions of the Fifth Amendment apply to the states through the Fourteenth Amendment. *See, e.g.*, *Branzburg v. Haynes*, 408 U.S. 665, 686-88 n.25 (1972) (noting that "indictment by grand jury is not part of the due process of law guaranteed to state criminal defendants by the Fourteenth Amendment"); *see also Apprendi*, 530 U.S. at 477 n.3. The sufficiency of a state indictment is appropriate for federal habeas corpus relief only when it can be shown that the indictment is so defective that it deprives the convicting court of jurisdiction. *Williams v. Collins*, 16 F.3d 626, 637 (5th Cir. 1994); *McKay v. Collins*, 12 F.3d 66, 68 (5th Cir.), *cert. denied*, 513 U.S. 854 (1994). State law dictates whether a state indictment is sufficient to confer a court with jurisdiction. *Id.* The Fifth Circuit in *McKay* held that the district court is "required to accord due deference to the state's interpretation of its own law that a defect of substance in an indictment does not deprive a state trial court of jurisdiction." 12 F.3d at 69 (citations omitted). Where the state court has been presented the question of the indictment's sufficiency on appeal and ruled that the indictment was not fundamentally defective, federal habeas review is foreclosed. *See Wood*, 503 F.3d at 412. This issue was raised on direct appeal and rejected by the Texas Court of Criminal Appeals. As such, relief is unavailable on claim number twenty-two.

|  |  |
|---|---|
| **Claim Number 23:** | **The cumulative effect of the above-enumerated constitutional violations denied Cortez due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution** |
| **Claim Number 24:** | **The cumulative effect of the above-enumerated constitutional violations denied Cortez due course of law under Article I, § 19 of the Texas Constitution** |

In his final two claims, Cortez argues that the cumulative effect of the various constitutional violations denied him due process of law, in violation of the Fifth and Fourteenth Amendments of the United States Constitution, and due course of law, in violation of Article I, § 19 of the Texas Constitution.

The Texas Court of Criminal Appeals rejected the claims on direct appeal as follows:

> Finally, in points of error forty-six and forty-seven, Cortez alleges that all of the aforementioned violations denied him due process and due course of law as prohibited by the federal and state constitutions. We have decided these claims against Cortez, and there is nothing here to persuade us to reconsider them here. These points are overruled.

*Cortez v. State*, 2011 WL 4088105, at *26 (citing *Saldano*, 232 S.W.3d at 108-09). Claim numbers twenty-three and twenty-four were presented in the exact same way they were presented to the Texas Court of Criminal Appeals. Cortez has made no effort to show, as required by 28 U.S.C. § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Cortez simply repeats the claim verbatim without trying to satisfy § 2254(d). Relief is unavailable because Cortez has not satisfied the requirements of § 2254(d).

Claim number twenty-three must also be rejected in light of clearly established federal law. The Fifth Circuit has regularly rejected cumulative error claims while noting that federal habeas relief is available only for cumulative errors that are of constitutional dimension. *Coble v. Quarterman*, 496 F.3d 430, 440 (5th Cir. 2007); *Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir.), *cert. denied*, 522 U.S. 880 (1997); *Yohey v. Collins*, 985 F.2d 222, 229 (5th Cir. 1993). The Fifth Circuit has emphasized that "[m]eritless claims or claims that are not prejudicial cannot be cumulated, regardless

of the total number raised." *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996) (citing *Derden v. McNeel*, 978 F.2d 1453, 1461 (5th Cir. 1992)), *cert. denied*, 519 U.S. 1094 (1997).

Claim number twenty-four must also be rejected because Cortez focuses on state constitutional issues, which are not cognizable in federal habeas proceedings. *See McGuire*, 502 U.S. at 67-68; *Jeffers*, 497 U.S. at 780; *Pulley*, 465 U.S. at 1. Cortez is simply not entitled to relief on claims twenty-three and twenty-four.

## Conclusion

Having carefully considered all of Cortez's claims, the Court is of the opinion, and so finds, that he has not shown that he is entitled to federal habeas corpus relief and his petition should be denied.

## Certificate of Appealability

An appeal may not be taken to the court of appeals from a final order in a federal habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Although Cortez has not yet filed a notice of appeal, the court may address whether he would be entitled to a certificate of appealability. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (A district court may *sua sponte* rule on a certificate of appealability because "the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before the court. Further briefing and argument on the very issues the court has just ruled on would be repetitious.").

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In cases where a district court rejected a petitioner's

constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*; *Henry v. Cockrell*, 327 F.3d 429, 431 (5th Cir. 2003). "When a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

In this case, reasonable jurists could not debate the denial of Cortez's § 2254 petition on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. *Miller-El*, 537 U.S. at 327 (citing *Slack*, 529 U.S. at 484). The Court thus finds that Cortez is not entitled to a certificate of appealability as to his claims. It is accordingly

**ORDERED** that the petition for a writ of habeas corpus is **DENIED** and the case is **DISMISSED** with prejudice. It is further

**ORDERED** that a certificate of appealability is **DENIED**. It is finally

**ORDERED** that all motions not previously ruled on are **DENIED**.

**SIGNED this 29th day of March, 2016.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE